*M. M. Taylor*, for the plaintiff.
*C. C. Milton*, for the defendant.

---

LOUIS F. GAGNON *vs.* SPERRY AND HUTCHINSON COMPANY.

Worcester. October 3, 1910. — October 19, 1910.

Present: KNOWLTON, C. J., MORTON, HAMMOND, LORING, & BRALEY, JJ.

*Contract*, What constitutes. *Damages*, In contract. *Evidence*, Opinion, Of profits. *Practice, Civil*, Exceptions. *Witness*, Examination.

In an action by a grocer against a trading stamp company for the breach of an alleged contract in writing by which the defendant agreed to furnish the plaintiff with trading stamps at a fixed rate for exclusive distribution in connection with sales on a certain street of a certain city, there was evidence that the daughter of the plaintiff, who was his bookkeeper, acting in behalf of the plaintiff and the defendant's manager acting in behalf of the defendant signed an agreement in writing containing the terms of the alleged contract and naming the district in which the distribution was to be made, and that, after the contract was signed, the defendant's manager took it away saying that he was going to have printed on the back of it a statement that the plaintiff was to have the exclusive right to distribute the trading stamps on a certain street, which constituted, or was in, the district named in the contract, and that he would return the contract to the plaintiff in a few days, but that he did not return it, and that, after the plaintiff had used one thousand trading stamps which he bought from the defendant under the terms of the contract, the defendant refused to sell him any more. The jury, by their verdict under the instructions given them, found that

it was the understanding of the parties that the contract as signed should become operative and binding upon the parties at the time of the signing, irrespective of the time when the indorsement should be printed upon the back of it. *Held,* that the question whether there was a completed contract was one of fact for the jury, and that their decision of it could not be said as matter of law to be unwarranted.

In an action for a breach of contract the plaintiff may be allowed to recover as damages a loss of prospective profits, where it appears that such loss was the natural, primary and probable consequence of the breach, that the profits arising from the performance of the contract and the loss likely to result from its non-performance were within the contemplation of the parties and that the anticipated profits are not so uncertain or contingent as to be incapable of reasonable proof.

In an action by a grocer against a trading stamp company for the breach of a contract in writing by which the defendant agreed to furnish the plaintiff with trading stamps at a fixed price for exclusive distribution in connection with sales on a certain street of a certain city, upon the question of damages there was evidence that the plaintiff before his contract with the defendant had been carrying on a retail grocery business in a small way, that his sales were small in amount and mostly on credit, that after he began to use the trading stamps his sales increased greatly in amount with a greater proportion of cash sales, that this change continued during the time that he distributed stamps purchased from the defendant under the contract, and that, when the defendant in violation of the contract refused to sell him any more stamps, his sales returned rapidly in amount and kind to the condition in which they had been before the contract. There also was evidence that the consideration held out by the defendant to induce the plaintiff to enter into the contract was that by the distribution of stamps the plaintiff's business would be more profitable, and that the plaintiff entered into the contract with that expectation and for that purpose. *Held,* that upon this evidence the jury had the right to find, in the absence of evidence of any other sufficient cause, that the sudden rise in the amount of sales was due to the distribution of stamps and the sudden fall was the natural, primary and probable consequence of the breach of the contract, and that such a loss was within the contemplation of the parties as likely to result from the non-performance of the contract.

Where in an action for a breach of contract the plaintiff seeks to recover a loss of anticipated profits, he does not lose his right to recover such damages merely because he fails to prove with precision the whole amount of the profits which he would have made if the defendant had performed his contract. If the plaintiff can show by reasonable proof that he certainly has lost some profits by reason of the defendant's breach of the contract and that a fairly accurate estimate can be made of the portion thus lost, he is entitled to have such loss of profits included in the damages.

In an action by a grocer against a trading stamp company for the breach of a contract in writing by which the defendant agreed to furnish the plaintiff with trading stamps at a fixed price for exclusive distribution in connection with sales on a certain street of a certain city, where it appeared that the plaintiff had made a purchase of trading stamps from the defendant under the contract and had used them while they lasted and that the defendant then had refused to sell him any more of the stamps, there was evidence that before the plaintiff made the contract with the defendant his sales were small in amount and mostly on credit, that after he began to use the trading stamps his sales increased

greatly in amount with a greater proportion of cash sales, and that when the defendant refused to sell him any more stamps his sales returned rapidly in amount and kind to the condition in which they were before the contract, and a finding was warranted that the sudden rise in the amount of the plaintiff's sales was due to the distribution of the stamps and that the sudden fall was the natural, primary and probable consequence of the breach of the contract and was contemplated by the parties as likely to result from its non-performance. It did not appear that, in order to attend to the increased sale caused by the use of the trading stamps, the plaintiff had hired any additional employees or had incurred any additional expense, and there was testimony that in the grocery business the profit upon the sales "if you give trading stamps " is "about fifteen per cent." *Held,* that it could not be said that the anticipated profits which the plaintiff sought to recover were so far conjectural or contingent that the question of their amount should not be submitted to the jury or that the jury were bound to confine themselves to giving nominal damages.

In an action by a grocer against a trading stamp company for the breach of a contract in writing by which the defendant agreed to furnish the plaintiff with trading stamps at a fixed price for exclusive distribution in connection with sales on a certain street of a certain city, where it appears that, after the plaintiff had made a purchase of trading stamps from the defendant under the contract and had used them to the great advantage of his business while they lasted, the defendant refused to sell him any more of the stamps, the daughter of the plaintiff, who was the bookkeeper in his grocery, may testify as to the effect of the distribution of the stamps upon the trade in the store and as to "the result [she] observed of lessening or increasing the number of customers after the stamps were exhausted," these being facts and not matters of opinion.

An objection of form to an answer of a witness as not being responsive to the question or as being in the nature of hearsay must be made specially. In the absence of any such special objection, an objection to the answer of a witness will be taken to relate only to matters of substance.

In an action by a grocer against a trading stamp company for the breach of a contract in writing by which the defendant agreed to furnish the plaintiff with trading stamps at a fixed price for exclusive distribution in connection with sales on a certain street of a certain city, where it appears that, after the plaintiff had made a purchase of trading stamps from the defendant under the contract and had used them to great advantage in his business while they lasted, the defendant refused to sell him any more of the stamps, and the plaintiff seeks to recover damages for the loss of the profits reasonably anticipated from the use of the stamps, the plaintiff may show that the profit upon the sales in the grocery business "if you give trading stamps " is "about fifteen per cent," this being one way and a proper way of estimating the profits of the plaintiff.

CONTRACT for the alleged breach of a contract in writing made on October 3, 1908, by which the defendant agreed to furnish the plaintiff with trading stamps at a fixed rate for exclusive distribution in connection with sales on a certain street in Fitchburg for one year or so long as the plaintiff continued in business. Writ dated March 20, 1909.

In the Superior Court the case was tried before *Aiken*, C. J. It appeared that in April, 1908, the plaintiff, who previously had worked in a chair shop, purchased a grocery business that was an established business and was carried on in a building owned by the plaintiff. He carried on this business without the use òf trading stamps until October 3, 1908, when, as he testified, he made a contract by which the defendant was to furnish him as long as he continued in business with trading stamps at a fixed rate per thousand. On October 3 he received a thousand stamps for which he paid $4. He testified that in about three weeks after that date he requested the defendant to furnish him with more stamps but that the defendant declined to sell him any more stamps, so that after the first of November he had no trading stamps to give his customers. He continued in business until April 1, 1909, when he sold out.

On the question whether there was a contract the testimony was as follows: Laura Gagnon, a daughter of the plaintiff who acted as his bookkeeper, testified that one Goldman, who was in the employ of the defendant, came to her father's store and tried to induce him to take trading stamps, that her father told him he didn't think he wanted stamps because when stamps were circulated before in Fitchburg they were obliged to go out of business and in some way it might injure his business if he was obliged to stop giving stamps. Goldman assured him there was no danger because they were legal and they would not be obliged to go out of business. Her father told Goldman he would think it over and he could call later in the week. On Saturday, October 3, Goldman, accompanied by one Demmon, who was the manager of the defendant, came to the store. In regard to that transaction at the store the testimony was as follows: " Q. Tell the talk at that time leading up to the signing of the paper. A. Father told him that he had decided that he would take them, that is, if he would be protected so it would not in any way injure him if they were obliged to go out of business, and Mr. Demmon told him there was no danger, that they were legal and they would not be obliged to go out of business and went on telling the numbers of stamps, the way we could get stamps — four dollars if we got one thousand

and three dollars and one half if we got five thousand.—
Q. If you bought in single pads of a thousand it was four
dollars? A. Yes.— Q. If in lots of five thousand, you got
them at a rate of three fifty? A. Yes.— Q. What was said
with relation to the time that your father was to have them?
A. Father told them that supposing that he could take the
stamps on that Saturday that if the next week they felt they
wanted to take the stamps away from him they could, and
I don't remember whether Mr. Demmon or Mr. Goldman spoke
up and said they couldn't because we are under contract, and
it was then they gave me the contract to sign. — Q. Will you
repeat? A. Father made the statement that supposing they
had been given stamps for a few weeks and they were taking
the stamps away we would be at a loss because our customers
that we induced to come to the store a short while on stamps
and then stopped giving them, and then Mr. Goldman and Mr.
Demmon said there was no danger because we were to be under
contract and it was then that they took the contract out and I
signed—I was going to sign it with a pencil and Mr. Goldman
told me not to sign as it would not be legal and he gave me a foun-
tain pen and I signed it. — Q. Will you tell us what kind of a
paper it was that they gave you to sign? A. It was the ordinary
size contract. — Q. Printed or written? A. Printed, if I remem-
ber correctly, and I think in old English printing. — Q. Did any-
body else sign the paper besides you? A. Yes, Mr. Demmon's
name was on it. — Q. Who is he? A. Manager of Sperry,
Hutchinson store. — Q. You say he signed the paper first? A.
Yes. — Q. And then what did you do? A. I signed it for my
father with my initials under my father's name. — Q. Who was
present in the room when that was done? A. My father, my
brother, a clerk of the store and Mr. Demmon and Mr. Goldman.
— Q. What became of that paper? A. After I had signed it, Mr.
Demmon folded it up and I asked him if I wasn't to get a copy
of it and they took out some other contracts they had showing
where they had printed on the back that they had exclusive
right to certain sections. — Q. What was there? A. There
was printed on the back that certain parties that have stamps
had exclusive right to certain sections of the city, and he said
he was going to print on the back of ours that we were to have

exclusive right on Daniels Street. — Q. That is the Cleghorn district? A. Yes, and that he would return the contract in a few days. — Q. Did he ever return that contract to you? A. No, sir; he did not. — Q. What were the contents of that contract? A. I cannot remember, I know that it began with, ' We, the undersigned, agree to furnish to the Sperry, Hutchinson ' — Q. Give some more of it. A. ' We, the undersigned, agree to furnish green trading stamps to Louis Gagnon ' — and then it followed in the Cleghorn district and as to the duration of the contract I am almost certain it said we could have it as long as we were in business, and I know we asked him and he said we could renew it at the end of the year. — Q. Either you could renew it at the end of the year or you could have it as long as you were in business? A. Yes. — Q. What were the terms you were to get the trading stamps on? A. We were to pay four dollars per thousand and in five thousand lots give fifty cents less, and one green trading stamp we were supposed to give with every ten-cent cash purchase from the store, and that we couldn't sell stamps to any of our customers but must give them to them when buying cash purchases. We couldn't sell stamps, as supposing a party had a book nearly full we couldn't sell the stamps for the purpose of filling of the book. — Q. If a person had four hundred and ninety-nine stamps and needed one he couldn't come in and buy stamps? A. No, sir. — Q. Had to buy goods? A. Had to buy goods."

On the question as to whether there was a contract, the defendant asked the Chief Justice to instruct the jury as follows:

1. Upon the evidence the plaintiff is not entitled to recover.

2. There is no evidence upon which the jury can find that an exclusive contract in writing was made.

3. There is no evidence upon which the jury can find that a written contract was executed and delivered to the plaintiff.

4. If there was no written contract executed by each of the parties there can be no recovery in this case.

5. There is no evidence upon which the jury can find a completed contract between the parties.

The Chief Justice gave the fourth instruction as requested and refused to give the others.

He concluded the portion of his charge relating to this subject

as follows: "Now, you will have in mind that it is denied by the Sperry, Hutchinson Company, and you have on the other hand that it is asserted, that there was a paper signed in Gagnon's store when Mr. Demmon, another representative of the Sperry, Hutchinson Company, was present, and the father and the son and certainly one of the daughters are claimed to have been present. If there was a completed agreement entered into and signed at that time, it would be effective and binding providing the parties understood that it became effective at the time of signing, although it was taken away for some writing in respect to the streets to be added to it. If it was the understanding of the parties that it was still incomplete and that something more was to be done before it should be effective and binding, then it would not be effective and binding at the time the signatures were affixed, and, if at the time the signatures were affixed, if that was the understanding of the parties, so that it became at that instant effective and binding, although there was some subsequent writing to be added nevertheless that would be an agreement complete. Ordinarily the last thing in the making of a contract is the putting of the name of the parties to it. So, as a general rule, in practical business life the undertaking is not complete until the signatures are affixed, and if something remains to be done it is incomplete. But if the parties agree at the time their signatures are affixed it is a binding contract, it is a binding contract even if there is something else to be added to it in the form of writing. Then your first inquiry, if you find there was an agreement in writing to the effect that Gagnon was to have stamps of Sperry, Hutchinson and Company so long as he continued in business, then, gentlemen, there remains but one other question and that is the question of damages. If this is not established by a fair preponderance of the evidence you do not need to go further, and your verdict is for the defendant."

The evidence in regard to damages is described in the opinion.

Upon the question of damages the defendant asked the Chief Justice to instruct the jury as follows:

1. If the plaintiff is entitled to recover, the amount is limited to such expenditures as he may have made for the purpose of carrying out the contract.

2. The plaintiff cannot recover profits which he alleges he would have made from sales of merchandise to customers.

3. The defendant cannot be held liable for uncertain consequences or possible results which may have ensued on account of the breach of the contract although they may be traceable to that cause.

4. There is no evidence upon which the jury can find that amount of damages which the plaintiff incurred on account of the withdrawal of the stamps.

The Chief Justice refused to give any of these instructions except so far as they were covered by his charge, the terms of which are immaterial although held by this court to be correct, because the principles applicable to the case are stated in the opinion.

The questions in regard to the admission of evidence are stated in the opinion.

The jury returned a verdict for the plaintiff in the sum of $847.08; and the defendant alleged exceptions.

*C. M. Thayer,* for the defendant.

*D. I. Walsh,* for the plaintiff.

HAMMOND, J. 1. As to liability. There was evidence that a paper writing was signed by the parties, in the plaintiff's store, on October 3, 1908, and that after it was signed Demmon the agent of the defendant took it away, so that he might "print on the back of" it a statement that the plaintiff was "to have exclusive right on Daniels Street," in the Cleghorn district. The question, whether it was the understanding of the parties that the contract as signed should then and there at the time of the signing become operative and binding upon them irrespective of the time when the indorsement should be printed upon the back, arose and was submitted to the jury under instructions which permitted them to find for the plaintiff only in case they should find such an understanding. The verdict therefore shows that they found in favor of the plaintiff on this question. Upon a careful reading of the record we are of opinion that the question was one of fact for the jury, and their decision cannot be said as matter of law to be unwarranted. In view of the manner in which the case was thus sent to the jury and of their decision upon the crucial question submitted to

them, it is manifest that the first, second, third and fifth rulings requested by the defendant were properly refused, — the first because there was evidence of a breach of the contract, the second and third because immaterial, and the fifth because there was evidence of a complete and binding contract.

2. As to damages. The law as to loss of profits as an element of damages for breach of contract is now quite well settled, yet sometimes difficulty is experienced in applying it to the cases as they arise. The loss of prospective profits may be allowed as an element of damages in an action for breach of contract where it appears that the loss was the natural, primary and probable consequence of the breach, that the profits arising from the performance of the contract or the loss likely to result from its non-performance were within the contemplation of the parties, and that the profits are not so uncertain or contingent as to be incapable of reasonable proof. *Fox* v. *Harding,* 7 Cush. 516. *Magnolia Metal Co.* v. *Gale,* 189 Mass. 124, and cases cited. *Hadley* v. *Baxendale,* 9 Exch. 341. *United States* v. *Behan,* 110 U. S. 338. *Howard* v. *Stillwell & Bierce Manuf. Co.* 139 U. S. 199. *Masterton* v. *Mayor of Brooklyn,* 7 Hill, 61.

There was evidence that the plaintiff was carrying on a retail grocery business in a small way; that his sales were small and mostly on credit; that after he began to use the trading stamps his sales greatly increased in amount, with a greater proportion of cash sales; that this change in their amount and nature continued during the few weeks in which he distributed stamps, and that when by reason of the defendant's breach of contract he could not procure stamps and continue the distribution his sales rapidly changed in amount and kind to the condition in which they were before the contract. There was also evidence that the consideration held out by the defendant to induce the plaintiff to enter into the contract was that by the distribution of stamps the plaintiff's business would be more profitable, and that the plaintiff entered into the contract with that expectation and for that purpose. Upon this evidence the jury had the right to find, in the absence of any other satisfactory cause, that the sudden rise in the amount of the sales was due to the distribution of stamps; that the sudden fall was the natural, primary and probable consequence of the breach of the contract, and

that such a loss was within the contemplation of the parties as likely to result from the non-performance of the contract.

It is urged however by the defendant that the profits likely to arise from the breach of the contract in this case are so uncertain and conjectural that no estimate can be made of them. There can be no doubt, as said by Bradley, J., in *United States* v. *Behan,* 110 U. S. 338, that "in order to furnish a ground of recovery in damages, they [profits] must be proved." It is not necessary however that the whole amount should be proved with absolute precision. . The jury can go no further than the proof. So far as the plaintiff can show by reasonable proof that he has lost profits he can have them included in the damages, and that is so even if there is beyond that line a penumbra which he cannot clear up. And the real question on this part of the case is not whether he has proved all the profits which it may be conjectured he might have made, but whether he has shown by reasonable proof that at least he certainly has lost some profits by the breach and that a fairly accurate estimate may be made of this portion.

. In addition to what has been hereinbefore stated as to the general nature and extent of his business and the cause of its rise and decline, it does not appear that in order to attend to this increased sale he hired any additional help or incurred any additional expense in any way or made any general change in his business. It fairly may be inferred from the evidence that he bought his stock in substantially the same way as before, and sold at substantially the same profit as before, less perhaps the money paid for the stamps; and there was testimony that in the business the profit upon the sales "if you give trading stamps" was "about fifteen per cent."

On all the evidence we think it cannot be said that the anticipated profits were so far conjectural or contingent that the question of the amount was erroneously submitted to the jury, or that the jury were bound to confine themselves to a merely nominal amount. There was no error in the manner in which the judge dealt with the rulings requested on the question of damages. So far as they were not covered by the change they were properly refused.

3. Some questions as to evidence remain for disposition. The

evidence of Laura Gagnon in answer to the question as to the effect of the distribution of the stamps upon the trade in the store was properly admitted.   It was in the nature of a statement of facts rather than of opinion.   The evidence of the same witness as to " the result . . . [she] . . . observed of lessening or increasing the number of customers after the stamps were exhausted " was also properly admitted.   Here also she was giving facts and not opinions.   The objection that she was stating some things on hearsay we do not think is now open to the defendant.   It made no specific objection on that ground when the testimony was given, and the general objection to the introduction of evidence as to profits must be held to apply only to the substance of the answer.   If the defendant had any objection to the form of the question, or to the answer as not being responsive to the question, or as being in the nature of hearsay, it should have made this special objection known.   In the absence of any such special objection both the judge and the plaintiff had the right to assume that only the general objection was relied upon by the defendant.   The evidence as to what percentage of the receipts in the grocery business was profit was properly admitted. It is plain that this was only one way of estimating, not the profits of another, as contended by the defendant, but simply the profits of the plaintiff.

*Exceptions overruled.*