**HENDRICKS & ASSOCIATES, INC., Plaintiff, Appellee,**

v.

**DAEWOO CORPORATION, Defendant, Appellant.**

No. 89–1583.

United States Court of Appeals, First Circuit.

Heard Jan. 8, 1990.

Decided Jan. 10, 1991.

---

Michael J. Keefe with whom Charles J. O'Malley and Johnson, O'Malley and Harvey, Boston, Mass., were on brief, for defendant, appellant.

Michael A. Fitz with whom Fitz & O'Sullivan, Holyoke, Mass., was on brief, for plaintiff, appellee.

Before BREYER, Chief Judge, BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

Daewoo Corporation appeals from a district court judgment awarding Hendricks & Associates (Hendricks) $375,000 in consequential damages, representing Hendricks's loss of prospective profits from anticipated future business with Champion Products, Inc., and $21,614.73 in consequential damages, representing commission credits withheld by Champion. We affirm the $21,614.73 damages award. We affirm an award for loss of prospective profits, conditioned on a partial remittitur, and remand for new trial or for amendment of the judgment.

## I  BACKGROUND

Champion, a wholesaler of sporting apparel, provided Hendricks with design specifications for a new line of fashion sportswear ("Stripe Collection") which Champion planned to market. Hendricks, a Massachusetts import agent, selected Daewoo, a Korean company, to manufacture the Stripe Collection goods. There were no direct contractual arrangements between Daewoo and Champion. Champion placed

purchase orders with Hendricks; Hendricks placed purchase orders with Daewoo.

James Hendricks founded Hendricks in 1979 as a consulting firm.[1]  In December 1981, James Hendricks contracted to consult with Champion, for a fee, concerning the overseas manufacture of sporting apparel and its importation into the United States. By the end of 1983, Hendricks had entered into similar contracts with eleven other companies.

Champion intended to develop overseas sources of supply to increase its domestic market competitiveness in certain lines of apparel. James Hendricks, hence Hendricks & Associates, possessed considerable experience in the importation of apparel manufactured in the Far East, a complex undertaking involving customs duties, tariffs and byzantine quota systems. Hendricks's role with Champion gradually evolved from fee-based consultant to "import agent." Hendricks assisted Champion in the selection of overseas manufacturers.

On the recommendation of Hendricks, Champion initially placed two small orders with Daewoo. Although Champion encountered minor quality problems with these early orders, its complaints to Daewoo were resolved satisfactorily through the efforts of Hendricks. In 1984 Champion launched its Stripe Collection line. With Champion's concurrence, Hendricks placed orders for the manufacture of the Stripe Collection goods with Daewoo, notwithstanding Champion's earlier complaints about minor defects in the goods previously manufactured by Daewoo.

Contractual arrangements for the Stripe Collection goods were structured differently than the two previous Daewoo transactions. Rather than acting as Champion's import agent as in the past, Hendricks was to act as the "middleman" between Champion and Daewoo. Hendricks placed purchase orders with Daewoo requiring Daewoo to manufacture the Stripe Collection goods to Champion's specifications. Hen-

---

1. Hendricks was incorporated in the Commonwealth of Massachusetts in 1983, with James Hendricks as its principal stockholder.

dricks in turn sold the goods to Champion at a five percent markup over Daewoo's sale price to Hendricks. Daewoo and Hendricks received payment by means of irrevocable letters of credit, funded entirely by Champion and negotiable "FOB Korea."

The Hendricks purchase orders required Daewoo to deliver the Stripe Collection goods directly to Champion in three shipments. Champion's inspection of the first shipment disclosed serious quality defects in a substantial number of garments. Upon notification by Hendricks, Daewoo assured Hendricks that all garments in the remaining shipments would conform to specifications, and Hendricks accordingly reassured Champion. The second shipment was no better than the first, however, and Champion determined on final inspection that the entire third shipment was unacceptable. By this time, of course, both Hendricks and Daewoo had received payment in full from Champion under the terms of the irrevocable letters of credit. In order to recover these payments and its inspection costs, allegedly aggregating $213,486.61, Champion issued "debit memoranda" against Hendricks's account with Champion. At the time the debit memoranda were issued, Hendricks's records reflected that it was owed $21,614.73 by

Champion. There is no evidence that Hendricks has ever been held accountable for the $191,871.88 balance. Champion is not a party to these proceedings.

Hendricks brought the present action against Daewoo for $213,486.61 in consequential damages, the total amount of the Champion debit memoranda, and for $150,000 in consequential damages for anticipated future profits allegedly lost by Hendricks as a consequence of Champion's termination of their business relationship. The jury did Hendricks one better by awarding it $275,000 in consequential damages in connection with the Champion debit memoranda, and $375,000 in consequential damages for loss of future profits. The district court denied Daewoo's motion for judgment notwithstanding the verdict. The court contemporaneously denied Daewoo's motion for new trial, on the condition that Hendricks remit all Champion debit memoranda damages in excess of $21,614.73 [2]. The $375,000 award for lost profits was permitted to stand.

## II  DISCUSSION

Under Massachusetts law,[3] a buyer who accepts nonconforming goods and "season-

**2.** Although Hendricks accepted the remittitur, on appeal Daewoo challenges the $21,614.73 award on the ground that Champion's debit memoranda "amounted to nothing more than bare assertions by Champion that it wanted money from plaintiff." We disagree. Champion's retention of the $21,614.73 credit due Hendricks represented an actual loss to Hendricks, directly attributable to Daewoo's breach. As discussed below, the evidence established that virtually the entire Stripe Collection was unmarketable. Thus, the $21,614.73 award was proper. *See infra* pp. 216–217.

**3.** Daewoo contends that the district court erroneously chose to apply Massachusetts, rather than New York, substantive law. A federal district court exercising its diversity jurisdiction must apply the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Bi–Rite Enter. v. Bruce Miner Co., Inc.,* 757 F.2d 440, 442 (1st Cir.1985). Massachusetts adopts a "functional" approach to choice-of-law issues, emphasizing the "interests of the parties, the States involved, and the interstate system as a whole." *Bushkin Associates, Inc. v. Raytheon Co.,* 393 Mass. 622, 473 N.E.2d 662, 668 (1985).

Under the functional approach, the forum applies the substantive law of the state which has the more significant relationship to the transaction in litigation. *See id.* 473 N.E.2d at 669–70; *Computer Systems of Amer. v. International Bus. Machines,* 795 F.2d 1086, 1092 (1st Cir.1986).

The contracts between Daewoo and Hendricks clearly bear a more significant relationship to Massachusetts than to New York. Hendricks is a Massachusetts corporation. Negotiation of the contract took place in Massachusetts and Korea. Subsequent communications between Daewoo and Hendricks involved Massachusetts. Hendricks received payment through a Massachusetts bank. Daewoo contends that there was significant contact with New York, in that the Stripe Collection goods were delivered to Champion in New York. First, it is not entirely clear that delivery of the Stripe Collection goods required under the Hendricks–Daewoo contracts took place in New York. Title to the Stripe Collection goods passed to Hendricks in Korea when the goods were loaded aboard a ship for transport to the United States. Thereafter, *Hendricks* tendered the goods to Champion in New York. Second, even assuming that delivery of the goods took place in New York,

ably give[s] the seller notice of the nonconformity of the goods to the contract [Mass. Gen.L. ch. 106, § 2–607[3]] 'may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable, ... [including in] a proper case any incidental and consequential damages' under § 2–715." *Matsushita Elec. Corp. of Am. v. Sonus Corp.*, 362 Mass. 246, 10 UCC Rep.Serv. (Callaghan) 1363, 1375, 284 N.E.2d 880, 890 (1972) (quoting Mass. Gen.L. ch. 106, § 2–714). There is ample evidence that Daewoo tendered nonconforming goods, within the meaning of section 2–106(2), *see* Mass.Gen.L. ch. 106, § 2–106(2), and that Hendricks gave Daewoo seasonable notification under section 2–607(3), *id.*, § 2–607(3).

*Consequential Damages*

[Consequential damages for] loss of prospective profits may be allowed ... where it appears that the loss was the natural, primary and probable consequence of the breach, that the profits arising from the performance of the contract or the loss likely to result from its nonperformance were within the contemplation of the parties, and the profits were not so uncertain or contingent as to be incapable of reasonable proof.

*Cannon v. Yankee Products, Inc.*, 21 UCC Rep.Serv. (Callaghan) 525, 530 (Mass.App. 1977) (quoting *Gagnon v. Sperry & Hutchinson Co.*, 206 Mass. 547, 555, 92 N.E. 761 (1910)) (applying common law and Uniform Commercial Code ("UCC") § 2–715). As a venerable Massachusetts case teaches:

The fundamental principle of law upon which damages for breach of contract are assessed is that the injured party shall be placed in the same position he would have been in, if the contract had

been performed, *so far as loss can be ascertained to have followed as a natural consequence and to have been within the contemplation of the parties as reasonable men as a probable result of the breach, and so far as compensation therefor in money can be computed by rational methods upon a firm basis of facts* .... When a claim for prospective profits is brought to the test of this principle, recovery can be had where loss of profits is the proximate result of the breach, and is such as in the common course of events reasonably might have been expected, at the time the contract was made, to ensue from a breach, and where it can be determined as a practical matter with a fair degree of certainty what the profits would have been.

*John Hetherington & Sons, Ltd. v. William Firth Co.*, 210 Mass. 8, 21, 95 N.E. 961 (1911) (emphasis added). *See also Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888, 893 (1st Cir.1988) (citing *Hetherington & Sons*, 210 Mass. at 21), *cert. denied*, 488 U.S. 1043, 109 S.Ct. 869, 102 L.Ed.2d 993 (1989).

These common law principles comport with the letter and spirit of UCC section 2–715(2). *See* Mass.Gen.L. ch. 106, § 2–715 official comment 2 (section 2–715(2) adopts the common law rule that a seller is liable for all consequential damages of which he had reason to know in advance, but requires the buyer to mitigate damages); *Cannon*, 21 UCC Rep.Serv. (Callaghan) at 530–31 (UCC § 2–715(2) and common law concurrently applied); 4 R. Anderson, *Uniform Commercial Code* §§ 2–715:7 & 2–715:10 (3d ed. 1983) (UCC does not displace common law requirements relating to causation and certainty of proof of damages).[4] UCC section 2–715(2) provides: "Consequential damages resulting from the seller's breach include (a) any loss resulting

---

given the greater number and significance of the Massachusetts contacts, Massachusetts substantive law governed the Hendricks–Daewoo contracts.

**4.** *Accord United California Bank v. Eastern Mountain Sports, Inc.*, 546 F.Supp. 945, 969 (D.Mass.1982) ("§ 2–715(2)(a) is in accord with the common law standard of foreseeability of the loss as a measure of whether consequential

damages will be recovered."), *affd.*, 705 F.2d 439 (1st Cir.1983). *See also Hydraform Prod. Corp. v. American Steel & Aluminum Corp.*, 127 N.H. 187, 498 A.2d 339, 345 (1985) ("[t]his reflection of *Hadley v. Baxendale*, 156 Eng.Rep. 145 (1854), thus limits damages to those reasonably foreseeable at the time of the contract") (Souter, J.).

from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." Mass.Gen.L. ch. 106, § 2–715(2)(a).

■ In sum, Massachusetts law, as embodied in its Uniform Commercial Code, permits an award of consequential damages for prospective profits lost as "the natural, primary and probable consequence of the breach," *Gagnon*, 206 Mass. at 555, 92 N.E. 761 (quoted in *Cannon*, 21 UCC Rep.Serv. (Callaghan) at 530), unless 1) the loss was not "such as in the common course of events reasonably might have been expected, at the time the contract was made, to ensue from a breach," *Hetherington & Sons*, 210 Mass. at 21, 95 N.E. 961, or 2) the extent of the loss has not been evidenced with a fair degree of certainty, *id.*

*Motion for Judgment n.o.v.*

The district court may grant judgment notwithstanding the verdict "only after a determination that the evidence could lead a reasonable person to only one conclusion," *Conway v. Electro Switch Corp.*, 825 F.2d 593, 598 (1st Cir.1987); *Hubbard v. Faros Fisheries, Inc.*, 626 F.2d 196, 199 (1st Cir.1980); namely, that the moving party was entitled to judgment, Fed.R. Civ.P. 50(b); *Chedd–Angier Production Co. v. Omni Publications Int'l, Ltd.*, 756 F.2d 930, 934 (1st Cir.1985) (The moving party "has failed to persuade us that the facts of this case so conclusively point to a verdict in its favor that fair-minded people could not disagree about the outcome."); *see also Gonzalez–Marin v. Equitable Life Assurance Society of the United States*, 845 F.2d 1140, 1144 (1st Cir.1988); *Pace v. Insurance Co. of North Amer.*, 838 F.2d 572, 575 (1st Cir.1988).

The district court "may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." *Wagenmann v. Adams*, 829 F.2d 196, 200 (1st Cir.1987); *Miranda v. Munoz*, 770 F.2d 255, 257 (1st Cir.1985); *Wildman v. Lerner Stores Corp.*, 771 F.2d

605, 607 (1st Cir.1985). The trial court is "compelled, therefore, even in a close case, to uphold the verdict unless the facts and inferences, when viewed in the light most favorable to the party for whom the jury held, point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have arrived at this conclusion." *Chedd–Angier Production Co.*, 756 F.2d at 934.

A denial of judgment n.o.v. is reviewed *de novo*, which means that we use the same stringent decisional standards that control the district court. *See Aggarwal v. Ponce School of Medicine*, 837 F.2d 17, 19 (1st Cir.1988); *Venancia Ferrer v. Sonia Zayas*, 914 F.2d 309, 311 (1st Cir.1990).

### PROSPECTIVE PROFITS FROM ANTICIPATED HENDRICKS–CHAMPION CONTRACTS

*Foreseeability*

■ In the idiom of the Uniform Commercial Code, prospective profits are recoverable as consequential damages insofar as their loss was caused by a breach which deprived the nonbreaching party of "general and particular requirements and needs" of which the breaching party, "at the time of contracting, had reason to know...." Mass.Gen.L. ch. 106, § 2–715(2)(a). The requirement of "foreseeability" speaks to what is "reasonably contemplated by the parties," *Delano Growers Cooperative Winery v. Supreme Wine Co., Inc.*, 393 Mass. 666, 40 U.C.C.Rep.Serv. (Callaghan) 93, 105, 473 N.E.2d 1066, 1075 (1985), and states an objective test. *See Hetherington & Sons*, 210 Mass. at 21, 95 N.E. 961.

There was substantial evidence from which a rational jury could have found that Daewoo had reason to know, when it entered into the Stripe Collection contracts, that there had been a continuous business relationship between Hendricks and Champion dating back to 1983, and that a reasonably prudent seller in Daewoo's position should have realized that it was probable that yet further deliveries of defective garments to Champion would have a severely detrimental effect on the Hendricks–Cham-

pion business relationship, even resulting in its outright termination and a consequent loss of future Champion contracts.[5]

We think that a rational jury could conclude in these circumstances that Daewoo should have foreseen that a nonconforming tender, as severe and pervasive as the present evidence demonstrates, probably would cause Hendricks, in the ordinary course of events, to lose future Champion contracts. *Compare Hawkins v. Jamrog,* 277 Mass. 540, 179 N.E. 224 (1931) (foreseeable that delivery of spoiled turkeys would cause boarding house to lose majority of boarders).[6]

### Causation

■ Daewoo's challenge to the causation determination fares no better. The evidence adduced at trial, with all reasonable inferences favorable to the verdict, would support a jury finding that Hendricks's loss of future contracts from Champion was a "natural, primary and probable consequence of [Daewoo's] breach," *Cannon,* 21 U.C.C.Rep.Serv. (Callaghan) at 530.[7]

Champion's former purchasing manager, Donald Sullivan, gave uncontroverted testimony that the volume of business Champion was doing with Hendricks had been increasing, that there were no obstacles to the continuation of that trend, and that business between Hendricks and Champion would have increased in the future had it not been for the quality problems Champion encountered with the Stripe Collection goods. James Hendricks testified that Hendricks had begun work on other clothing lines for Champion, which went to other import agents after the Stripe Collection debacle. Sullivan testified that Champion dealt with import agents other than Hen-

5. Daewoo's contention that Hendricks never communicated to Daewoo the possibility that a breach by Daewoo might result in Hendricks's loss of Champion as a business client is unavailing. Actual knowledge is not a requisite of foreseeability. *See* 5 *Corbin on Contracts* § 1009 (1964). The proper inquiry is whether the loss would be within the contemplation of a reasonably prudent seller at *the time the contract was made. Id.* §§ 1008–09; *Hetherington & Sons,* 210 Mass. at 21, 95 N.E. 961. Indeed, Daewoo manufactured garments for Champion at Hendricks's request on two earlier occasions, which reasonably should have alerted Daewoo that Champion expected its merchandise to be manufactured to precise design specifications. During the course of the "Graduate and Alumnus" sweater and the "Regatta" windbreaker transactions, Champion reacted strongly to relatively minor departures from design specifications. Considerable effort and expense was required on the part of Hendricks to placate Champion on those occasions and Daewoo was compelled to make price concessions in connection with the "Regatta" windbreaker transaction.

6. Daewoo concedes that termination of Champion's business relationship with Hendricks would have been a reasonably foreseeable consequence of Daewoo's delivery of "vast quantities of defective" Stripe Collection goods. There is abundant evidence that the manufacturing defects in the Stripe Collection goods were severe and pervasive. Donald Sullivan, Champion's purchasing manager at the time the Stripe Collection garments were received, testified that Champion's inspections revealed that the first two shipments included substantial numbers of garments marred by oil and grease stains, crooked plackets and gussets, open seams, running colors, uneven stripes, uneven shading, and large holes. The third shipment appeared acceptable on initial inspection, but subsequent "wash tests" to determine shrinkage resistance revealed severe latent defects. By the fifth washing, the seams would open and the apparel would come apart. Sullivan stated that the entire third shipment of Stripe Collection goods (pants) was "totally unacceptable," so defective in fact that Champion considered cutting up the garments rather than risk having defective clothing removed from the dumpster and worn. Sullivan added that pants, delivered to Champion's customers before Champion had discovered the latent defects, were returned. Finally, inspection revealed that there were rejection stickers, written in Korean, on numerous articles of apparel in all three shipments.

7. The jury was instructed in accordance with Massachusetts law.

Hendricks' second claim is that as a result of the defective goods delivered by Daewoo, Champion Products has refused to do any more business with Hendricks and Associates. Hendricks requests damages in an amount equal to the future profits it lost as a result of Champion's decision. You must first determine [that] Champion's decision to stop using the services of Hendricks and Associates was a natural, primary and probable consequence of Daewoo's failure to deliver goods in accordance with Champion's specifications.

*See Cannon,* 21 U.C.C.Rep.Serv. (Callaghan) at 530; *cf. Gagnon,* 206 Mass. at 555, 92 N.E. 761 (pre-UCC case); *Hetherington & Sons,* 210 Mass. at 21, 95 N.E. 961 (same).

dricks due to the problems encountered with the Stripe Collection goods.

There was substantial evidence from which the jury could infer a causal connection between Daewoo's breach and Champion's cessation of its business relationship with Hendricks. Champion enjoyed an established reputation as a marketer of high quality apparel. There was direct evidence that the Stripe Collection was its fall "fashion statement" and that it was "very important" to Champion. There was direct evidence that many constituent, color-coordinated units of apparel in the Stripe Collection, including all of the pants, were defective. Thus, there was substantial evidence that virtually the entire Stripe Collection was unmarketable ("too risky to market").

The jury reasonably could infer that *Champion* sustained significant economic loss as a direct result of Hendricks's failure to tender conforming Stripe Collection goods: loss of capital invested in the design, manufacture, promotion and inspection of the Stripe Collection line, and loss of anticipated profits on the Stripe Collection merchandise. Considering the economic harm which Champion could reasonably have been found to have sustained as a direct consequence of Hendricks's failure to tender conforming goods, and the uncontroverted evidence that Hendricks's business with Champion had been increasing and was likely to continue to do so, we conclude that a rational jury could have found that Hendricks's loss of future contracts with Champion was a "natural, primary and probable consequence" of Daewoo's tender of nonconforming garments to Hendricks. *See Cannon*, 21 U.C.C.Rep. Serv. (Callaghan) at 530.

We therefore conclude that the district court correctly denied Daewoo's motion for judgment n.o.v. on Hendricks's claim for consequential damages for loss of prospective profits. *See Conway*, 825 F.2d at 598.[8]

---

**8.** In order to withstand Daewoo's motion for judgment n.o.v., Hendricks was also required, under Massachusetts law, to prove the *amount* of its prospective profits with a fair degree of certainty. *Hetherington & Sons*, 210 Mass. at

## THE DEBIT MEMORANDA DAMAGES

■ Under its existing contracts with Daewoo and Champion, Hendricks required Stripe Collection goods manufactured in conformity with Champion's design specifications. Viewed in the light most favorable to the verdict, there was substantial evidence to support the $21,614.73 jury award for financial loss directly occasioned Hendricks as a reasonably foreseeable, natural, primary, and probable consequence of Daewoo's breach.

There was ample evidence that Daewoo had actual knowledge of the Stripe Collection resale contracts, as well as the two earlier contractual arrangements among the parties. Moreover, the Stripe Collection documentation itself, particularly its payment and delivery terms, should have alerted Daewoo to the restructured business relationship between Champion and Hendricks. A rational jury therefore could have found 1) that Daewoo knew or should have known that conforming Stripe Collection goods were essential to enable Hendricks to fulfill its contractual obligations to Champion, and 2) that Champion would attempt, in the ordinary course of events, to recover from Hendricks any economic loss caused by Daewoo's failure to deliver conforming goods. In these circumstances, and considering the substantial losses which Champion reasonably could have been found to have sustained as a direct consequence of Hendricks's inability to tender conforming goods on their existing contracts, we cannot say that a rational jury could not have concluded that Champion's attempt to recover its losses from Hendricks was a "natural, primary and probable consequence" of Daewoo's breach, *Cannon*, 21 U.C.C.Rep.Serv. (Callaghan) at 530, which was reasonably foreseeable to Daewoo at the time it contracted with Hendricks. Furthermore, Hendricks's records provided the jury with the required firm basis in fact upon which to calculate the amount of these damages.

---

21, 95 N.E. 961. We conclude that Hendricks met that requirement only as to a portion of the $375,000 consequential damages award. *See infra* pp. 217–221.

We therefore conclude that the district court correctly denied Daewoo's motion for judgment n.o.v. on the judgment for consequential damages in the amount of $21,-614.73 representing immediate losses occasioned Hendricks by Daewoo's breach. *See Conway*, 825 F.2d at 598.

### Motion for New Trial

A motion for a new jury trial enlists the sound discretion of the district court. *Conway*, 825 F.2d at 598. "[A] trial judge cannot displace a jury's verdict merely because he disagrees with it or would have found otherwise in a bench trial," *Milone v. Moceri Family, Inc.*, 847 F.2d 35, 37 (1st Cir.1988), or because "a contrary verdict may have been equally—or even more easily—supportable" on the evidence, *Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1333 (1st Cir.1988). Rather, it must appear that the verdict is "against the clear weight of the evidence," *Coffran v. Hitchcock Clinic, Inc.*, 683 F.2d 5, 6 (1st Cir.), *cert. denied*, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982); otherwise put, it must appear that there has been a "manifest miscarriage of justice," *Freeman*, 865 F.2d at 1334 (citing cases).

An appeal from a denial of a motion for new jury trial "must penetrate a pair of bucklers. In the first instance, deference is due to 'the jury's constitutionally sanctioned role as finder of fact;' and then, deference is due to the trial judge's 'superior ability to monitor the conduct of trial and assess the credibility of the witnesses....'" *Freeman*, 865 F.2d at 1334 (quoting *Mayo v. Schooner Capital Corp.*, 825 F.2d 566, 570 (1st Cir.1987)). Thus, we review the denial of a motion for new trial under an "abuse of discretion" standard, which means that we must affirm unless it is made to appear that the verdict was so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice. *Hubbard*, 626 F.2d at 200.

### PROSPECTIVE PROFITS FROM ANTIC-IPATED HENDRICKS–CHAMPION CONTRACTS [9]

#### Evidence of Amount of Prospective Profits

■ We can only conclude that no loss of prospective profits in an amount even approaching the $375,000 consequential damages award was proven in the manner required by Massachusetts law. A plaintiff "must establish [its] claim upon a solid foundation in fact, and cannot recover when any essential element is left to conjecture, surmise or hypothesis." *White Spot Constr. Corp. v. Jet Spray Cooler, Inc.*, 344 Mass. 632, 183 N.E.2d 719, 722 (1960) (quoting *Hetherington & Sons*, 210 Mass. at 22, 95 N.E. 961). Consequential damages for loss of prospective profits must be "capable of ascertainment upon some definite standard, either of market value, established experience, or direct inference from known circumstances," and an award of consequential damages must be based on evidence which demonstrates "with a fair degree of certainty what the profits would have been." *Hetherington & Sons*, 210 Mass. at 21, 22, 95 N.E. 961. When "damages are sought[,] they must be proved and not left ... to speculation." *Snelling & Snelling of Massachusetts, Inc. v. Wall*, 345 Mass. 634, 189 N.E.2d 231, 232 (1963) (claim for lost profits resulting from defendant's violation of "no competition" agreement too speculative, absent (i) proof that fees collected in violation of agreement would otherwise have gone to plaintiff and (ii) proof of amount of profit which would have been realized from fees).

The testimony of James Hendricks provided the principal proof on which the jury's projections and calculations of future profits must have depended. Central to the Hendricks testimony was a chalkboard presentation of Hendricks's actual financial performance during the pre-breach fiscal years 1983 and 1984, its *actual* 1985 fiscal year performance,[10] and a fiscal 1985 finan-

---

9. We conclude, without separate discussion, that the district court correctly denied the motion for new trial on the jury's award of $21,614.73 for damages occasioned by the Champion debit memoranda. *See supra* note 2; text at 216–217.

10. James Hendricks testified that these figures were from a "report showing [the firm's] income from Champion in [fiscal year] 1983, '84 and '85 .., and [its] tax returns."

cial *projection* prepared by Hendricks before the Daewoo breach. The import of the Hendricks testimony is summarized in the following table, admitted as Defendant's Exhibit A:

## EXHIBIT A

| Fiscal Year | Total Expenditures * | Income (i.e. revenue) from Champion * | Total Profits * |
|---|---|---|---|
| 1983 | 188 | 75 | 18 |
| 1984 | 350 | 170 | 20 |
| 1985 (proj.) | 350 | 170 | 70 |
| | | 50 [11] | |
| 1985 (actual) | 256 | 3 | (57) |

* (thousands of dollars)

With respect to each fiscal year, James Hendricks testified to Hendricks's (1) aggregated "total expenditures" (i.e., "travel, salary, office; any other expenses associated with the business") in servicing *all* its clients, including Champion; (2) its aggregate "profit margin" (i.e., its annual *profit* on *all* accounts, including the Champion account); and (3) total "income from Champion" (i.e., total *revenues*, as distinguished from *profits*, realized from its contracts with Champion).

### Evidence of Past Profits

Hendricks's past earnings experience provided the jury with no evidentiary basis, *see Hetherington & Sons*, 210 Mass. at 21, 95 N.E. 961; *Redgrave*, 855 F.2d at 893, firm or infirm, from which to project anticipated future profits from Champion. There was no evidence whatever, nor does Hendricks even contend, that it ever realized a profit in its business dealings with Champion at any time. In fact, Hendricks's own evidence demonstrates precisely the contrary—that Hendricks consistently *lost* money in its business dealings with Champion.[12] Thus, Hendricks's self-styled "established earnings record," without more, could provide no firm footing for an inference that Hendricks sustained a loss of prospective profits as a result of Champion's termination of their business relationship. *Compare Rombola v. Cosindas*, 351 Mass. 382, 220 N.E.2d 919 (1966) (race horse's *proven ability* and *consistent winnings*, in various conditions, sufficient to support recovery of prospective profits for period plaintiff was deprived of its use).

### Projection of Future Profits

■ Similarly, there was insufficient evidence that Hendricks would profit from any prospective business dealings with Champion *after fiscal year 1985*. The jury was given no firm factual basis from which to project *or* calculate anticipated revenues *or* profits from any putative post–1985 Champion contracts. There were no gross revenue or expense projections, let alone a rational formula or evidentiary predicate

**11.** The $50,000 figure represented projected income (revenue) to Hendricks from an anticipated contract with Champion relating to a collection of polo shirts on which Hendricks did advance work in fiscal year 1984, before Daewoo's breach. Hendricks projected that it would have realized gross revenues of $50,000 in fiscal 1985 if such a contract had materialized; it did not. *See infra* note 15.

**12.** James Hendricks testified that from 50% to 60% of Hendricks's "total operating costs" in fiscal years 1983 and 1984 were attributable to the Champion account. The application of that cost formula (the only one available) to Hendricks's total expenditures, *see supra* Exhibit A, at 21, compels the conclusion that Hendricks sustained operating losses on its Champion account in fiscal years 1983 and 1984, since one half of Hendricks's total expenditures in 1983 and 1984 would amount to $94,000 and $175,000, respectively, compared with annual Champion revenues of $75,000 and $170,000, respectively.

for projecting profits after fiscal year 1985.[13]

The only evidence that Hendricks anticipated future *profits* from Champion was James Hendricks's forecast for fiscal year 1985, prepared prior to Daewoo's nonconforming tender on the Stripe Collection contracts. *See* Exhibit A, *supra* p. 218 & n. 11. James Hendricks explained the rationale for the fiscal 1985 profit forecast.

> You base your forecasts on your current client base, what they did last year. In conversations with them what they tell you that they expect to do this year. And then you add to that anything that you have conversation with them about what they are going to place with you over and above last year. Any new items, and about what the quantities are, and then we estimate the cost, and then we make a projection. You have to do that for the banks. And also, to estimate how much money you can spend against that.

On the basis of Hendricks's own evidence, ascribing 50% to 60% of its *total* costs (expenditures) to Champion revenues alone, the 1985 fiscal year projection would indicate that Hendricks, at most, might expect $45,000 in profits from Champion on anticipated gross revenues of $220,000.[14] Even the fiscal 1985 profit projection is entirely dependent, of course, on James Hendricks's forecast, reflected in Exhibit A, *supra* p. 218, that 1985 operating costs would remain at the same level as 1984 costs, while fiscal 1985 revenues from Champion would increase by $50,000.[15] The rationale for these critical assumptions was that "[w]e felt that we had built up to a level now that we could probably maintain, so we were expecting to spend the same amount of money." As for anticipated fiscal 1985 revenues from Champion, James Hendricks "assumed we would maintain that same business with Champion [staple items] and that we would probably increase by 50 thousand dollars." Thus, the fiscal 1985 forecast was founded entirely on two precarious assumptions relating to the anticipated polo shirt contract with Champion: (i) Hendricks would generate $50,000 in additional gross revenue, all of it profit, (ii) at *no* additional expense to Hendricks.

Nevertheless, these assumptions were more than mere *ipse dixit*. *Compare Ricky Smith Pontiac, Inc. v. Subaru of New England, Inc.*, 14 Mass.App. 396, 440 N.E.2d 29, 50 (1982) (in action for loss of prospective profits, plaintiff must present "specific evidence" that costs would not increase along with revenues); *cf. Redgrave*, 855 F.2d at 899 (conclusory statement—that business opportunities were lost because of breach—not sufficient to support award of consequential damages; evidence required). James Hendricks testified, without contradiction, that when his 1985 forecast was made he had already "priced" and "sampled" the anticipated polo shirt contract. Donald Sullivan testified that Hendricks "had done all the work" on the polo shirt contract. Their testimony could rationally be interpreted to indicate that most of the costs associated with the anticipated polo shirt contract may have been incurred in fiscal 1984, which could conceivably support an inference that little remained to be done in fiscal 1985 to generate the $50,000 in increased revenue forecast for fiscal 1985.

**13.** The only other evidence on which the jury could have based a projection of future profits beyond fiscal year 1985 was Donald Sullivan's amorphous testimony that, until the Stripe Collection debacle, there appeared to be no obstacle to continued growth in Hendricks's business *revenues* from Champion. Sullivan's broad statement was dimensionless, however, as no *attempt* was made even to approximate the anticipated amount or temporal reach of any future *revenues* from Champion.

**14.** Total Champion revenues of $220,000, reduced by $210,000 to $175,000 (50%–60% of total expenditures of $350,000) in operating costs, would result in $10,000 to $45,000 in pretax profit. *See supra* note 11.

**15.** The $50,000 revenue increase was based on a project—a collection of polo shirts—that Champion had discussed "moving offshore" (i.e. importing). According to James Hendricks, "it would have been a million of product," "of which we made [i.e., realized *total revenues*] about five percent ... [s]o that's where the 50 thousand dollars comes from." *See supra* note 11.

Although we consider the question very close, we cannot say that James Hendricks's uncontroverted fiscal 1985 projection, weak as it was, was insufficient to support a $45,000 award of consequential damages for loss of prospective profits from Champion. *Compare City Welding & Mfg. v. Gidley–Eschenheimer*, 16 Mass. App. 372, 451 N.E.2d 734, 736 (1983) (affirming award of lost profits based upon plaintiff company president's estimate, even though president did not articulate basis for calculations); *cf. Agoos Leather Cos. v. Amer. & Foreign Ins. Co.*, 342 Mass. 603, 174 N.E.2d 652, 654–56 (1961) (affirming award on insurance policy based upon president's estimate of value of destroyed buildings, even though estimate "was very general in terms and far from a comprehensive analysis.").

While we find that there was sufficient evidence that Hendricks sustained a loss of $45,000 in prospective fiscal 1985 profits, we conclude that the jury rationally could not infer, as there was no evidence whatever, that profits could be anticipated from Champion *beyond fiscal 1985*, let alone for the extended future period necessary to substantiate a jury award of $375,000.[16] Hendricks presented absolutely no evidence, and articulated no rational hypothesis, warranting a damages award, in any amount, for prospective profits beyond fiscal 1985. Although a rational jury might infer from Sullivan's and James Hendricks's testimony that future revenues from Champion would increase, Hendricks offered the jury no rational or evidentiary framework for contriving future profit or revenue projections within any discernible temporal dimension.[17]

We are unable even to conjure a rational interpretation of the evidence which would support the $375,000 award for loss of prospective profits. The evidence that Hendricks never earned an annual profit of more than $20,000, in any fiscal year, from *all* its clients, and that it *never* earned a profit from Champion, is far too fragile a platform from which to launch an unguided projection of future profits, from Champion alone, worth $375,000 in 1988.

With no evidence of *past* profits, no forecast of future profits, future profit margins, future business revenues or expenses, beyond fiscal 1985, and no formula or method for divining any other element in a rational projection or calculation of prospective profits, the jury was left entirely to guesswork in a decisional endeavor bedeviled with difficulty and uncertainty in the best of circumstances. We are left with no alternative but to conclude that Hendricks failed, for the most part, to " 'establish [its] claim upon a solid foundation of fact,' " *Snelling & Snelling*, 189 N.E.2d at 232 (quoting *Hetherington & Sons*, 210 Mass. at 22, 95 N.E. 961), leaving it entirely to impermissible " 'conjecture, surmise or hypothesis,' " *id. See also Redgrave*, 855 F.2d at 893.[18]

16. Any long range profit projection beyond fiscal year 1985 can only have been based on assumptions yet more attenuated and amorphous than the fiscal 1985 forecast, as no evidence and no methodology was presented at trial with which the jury could construct a rational framework for projecting profits beyond fiscal 1985. So far as the record on appeal reveals, Hendricks offered no rationale or evidence for a projection of profits after fiscal year 1985.

17. All evidence relating to Hendricks's past earnings performance conclusively demonstrates consistent net losses on its Champion account. Even assuming that Hendricks could expect the same profit margin on its account with Champion as it had earned in the past from all clients combined (Exhibit A indicates that *total* company profit for fiscal years 1983

and 1984 approximated 5% to 9% of total revenues), Hendricks would have to have established, with a fair degree of certainty, that it anticipated more than $75 million in future Champion contracts in order to generate future profits having a present value of $375,000 in 1988. *This compares with peak actual revenues of $170,000 from Champion in any fiscal year* (1984). *Assuming a 10% rate of return*, the generation of $375,000 in profits would require revenues of $3.75 million; revenues at *5% of contract price* would require future contracts totalling $75 million. Hendricks presented no evidence, nor, as best we can learn from the record on appeal, did it articulate a contention, upon which any such massive increase in future Champion business might be inferred.

18. The remaining arguments advanced on appeal are without merit.

## III  CONCLUSION

The jury could have found, without impermissible resort to surmise and speculation, that Hendricks was entitled to recover no more than $45,000 for loss of prospective profits as a consequence of Daewoo's breach. Accordingly, the judgment award of consequential damages for loss of prospective profits is *affirmed,* conditioned on a remittitur of damages in excess of $45,-000. *See In re Knickerbocker,* 827 F.2d 281, 289 (8th Cir.1987) (remand for new trial conditioned on partial remittitur where jury rationally could have awarded damages for loss of anticipated profits in amount of remittitur); *Kolb v. Goldring, Inc.,* 694 F.2d 869, 875 (1st Cir.1982) (" '[A] remittitur award reducing a jury's award to the outer limit of the proof is the appropriate remedy where the jury's damage award exceeds the amount established by the evidence.' ") (quoting *Goldstein v. Manhattan Inds., Inc.,* 758 F.2d 1435, 1448 (11th Cir.1985)). Otherwise, Daewoo's motion for new trial on the amount of consequential damages for loss of prospective profits must be granted.

*The judgment of the district court is affirmed in all other respects and the case is remanded to the district court for further proceedings consistent herewith.*