Agoos Leather Companies, Inc. & another[1] *vs.* American and Foreign Insurance Company & others.[2]

Suffolk.    February 6, 1961. — May 9, 1961.

Present: Wilkins, C.J., Spalding, Williams, Whittemore, Cutter, & Kirk, JJ.

*Insurance,* Fire insurance: amount of recovery for loss. *Evidence,* Of value. *Practice, Civil,* Exceptions: whether error harmful. *Error,* Whether error harmful. *Words,* "Actual value."

Discussion of the principles of ascertainment of the "actual cash value" of property covered by a standard Massachusetts fire insurance policy. [607–609]
At the trial of an action on an insurance policy insuring buildings of a leather company or a tannery company destroyed by fire, an officer of the companies who for twenty years before the fire had been "intimately familiar" with the buildings and "knew the condition of the plant" when it ceased operations as a tannery about three months before the fire and

---

[1] Agoos Tanning Company.

[2] Centennial Insurance Company, The Home Insurance Company, Maryland Casualty Company, Newfoundland-American Insurance Company, and St. Paul Mercury Insurance Company.

was a tannery expert was properly permitted to express an opinion as to "the value of the buildings" on the date of the fire "conducted as a tanning place of business" or "for the purpose of a tannery," even though he did not claim to be "an expert on anything"; and with his testimony the evidence of the value of the buildings on that date was not so slight and so indefinite as to require direction of a verdict for the insurer.  [609–610]

On the issue of the value of insured factory buildings at a time when they were destroyed by fire, an agreement between the owner and a wrecking company for the demolition of the buildings, executed shortly after the owner had "decided to liquidate the business" and the plant had ceased operations and two weeks before the fire, would have relevance to show absence of market value of the buildings on the date of the fire.  [610–611]

Where the record in an action by two corporations upon an insurance policy, for the loss of substantial factory buildings in a fire occurring after the plaintiffs had "decided to liquidate the business" and the plant had ceased operations and an agreement with a wrecking company for the demolition of the buildings had been signed in the name of one of the corporations by its president, left in doubt which corporation owned the buildings and the precise relationship between the corporations and whether the making of the agreement by the president had been authorized or ratified by either corporation, there was no error in the exclusion of the agreement when offered generally by the insurer.  [611]

At the trial of an action by a corporation on an insurance policy for the loss of its buildings by fire occurring two weeks after its president had executed in its name an agreement with a wrecking company for the demolition of the buildings, there was no error prejudicial to the insurer in the exclusion of the agreement even though it would have had some tendency to impeach the president's testimony that he had no opinion as to the value of the buildings.  [611–612]

CONTRACT.  Writ in the Superior Court dated February 27, 1958.

The action was tried before *Paquet,* J.

The case was argued in February, 1961, before *Wilkins, C.J., Whittemore, Cutter,* & *Kirk,* JJ., and afterwards was submitted on briefs to all the Justices except *Spiegel,* J.

*Zipporah B. Wiseman, (Joseph Alter* with her,) for the defendants.

*George A. McLaughlin, (A. Morris Kobrick & Francis X. Meaney* with him,) for the plaintiffs.

CUTTER, J.  The plaintiffs (referred to individually as Leather and Tanning) seek to recover upon six insurance policies for the loss by fire of their tanning factory buildings in Lynn.  These policies insured ''Agoos Leather

Companies, Inc. and/or Agoos Tanning Co." for an aggregate face amount of $100,000 with respect to "an idle . . . vacant and unsprinklered plant." The plaintiffs "decided to liquidate the business" and the plant ceased operations as a tannery about Labor Day, 1956. It burned on November 29, 1956.

The jury found for the plaintiffs in the sum of $81,410 which included interest from December 5, 1956, which the defendants contend amounted to $11,429.85, thus making the principal sum of recoverable insurance $69,980.15. The defendants present their exceptions to the trial judge's refusal to direct a verdict for them and to certain rulings upon evidence. The evidence, including the facts already set forth, is stated in its aspect most favorable to the plaintiffs.

1. The policies are standard Massachusetts fire insurance policies (see G. L. c. 175, § 99, as amended through St. 1951, c. 478, § 1; see also G. L. c. 175, §§ 95, 96) and give coverage "to the extent of the actual cash value of the property at the time of loss." The defendants, in support of their exception to the denial of a directed verdict, argue only that the plaintiffs failed to sustain their burden of proving the amount of their loss, i.e. the value of their buildings on the day of the fire.

The evidence of value was meager and some questions were not very clearly directed to value as of the day of the fire, although they could be interpreted as referring to value on that day. The plant had an aggregate content of 1,586,103 cubic feet. The oldest building was about eighty years old and "the most recent . . . was built in 1934." They were "frame and brick" or "wooden structures with steel members, having party walls and passageways leading from one building to another. You could start at one end of the buildings and go through each one without going outside." There were at least four buildings. Building A was a four story building and an adjacent building had at least three floors. There were also a brick boiler building and a two story building.

After operation of the plant as a tannery ceased in September, 1956, the machinery, equipment, and other personal property in the plant had been sold and was being removed. Pipe was being broken up, including the sprinkler pipe system. There had been a "for sale" sign on the plant and "[p]eople came to see the plant from time to time." It was last "shown . . . to a prospective purchaser about three . . . weeks before the fire."

One Sart testified on the issue of value. He was president of Tanning and vice-president and general superintendent of Leather, "in charge of repairs, replacement and construction." He "had once owned his own tanning company and . . . [had been] involved in the purchase of a tannery by Mr. Agoos in Salem." At or about the time of trial he was a consultant to three leather companies and a shoe company in work which "involved the entire field of tanning, buildings, and productive equipment. He . . . [had] been engaged in the tanning business for forty . . . years . . . . From 1936 on he knew what was done to the buildings" and "was . . . intimately familiar with" them. On Labor Day, 1956, he "knew the condition of the plant." It does not appear that any objection to Sart's testimony, mentioned below, was made specifically on the ground that Sart was not qualified to testify. In any event, the trial judge had ample ground for permitting Sart, a corporate officer who knew the plant and was also a tannery expert, to express an opinion as to value, even though he did not claim to be "an expert on anything." See *Rubin* v. *Arlington*, 327 Mass. 382, 384; *Winthrop Prod. Corp.* v. *Elroth Co. Inc.* 331 Mass. 83, 85.

Subject to the defendants' exception, Sart testified that "the fair cash value of these buildings on the day of the fire without equipment and without personal property" was in his opinion $250,000, including the land, but disclaimed knowing "anything about the values of land as an expert." He later testified that this opinion was on the basis that the plant would be "conducted as a tanning place of business" or "for the purpose of a tannery." There-

after he gave the opinion that "the value of the buildings" was $200,000.

The defendants offered no expert testimony upon the issue of the value of the destroyed buildings. Their efforts to introduce evidence of a contract for demolition of the buildings (discussed *infra*) were unsuccessful.

"The words 'actual value' in the policies . . . are to be interpreted in the light of the nature of the insurance contract as a contract of indemnity. They import that recovery for loss cannot be based upon a value dependent upon fanciful considerations . . . . But the words 'actual value' do not import that recovery is limited to market value. . . . '[M]arket value does not in all cases afford a correct measure of indemnity. . . . In some cases there is no market value, properly speaking, and in others, if there is, it plainly would not of itself afford full indemnity.' . . . [T]he so called market value of . . . buildings, based either on their market value for the purpose of removal or on the amount by which they increase the market value of the real estate as a whole, may not be a true measure of indemnity for direct loss by fire. . . . On the other hand, even where market value will not afford the indemnity for which the . . . insurance provides, the cost of replacement, less depreciation, is not conclusive as to the actual value . . . . But it is important evidence of such value to be considered with other evidence." See *Kingsley* v. *Spofford,* 298 Mass. 469, 475–476; *Gechijian* v. *Richmond Ins. Co.* 305 Mass. 132, 141; *New England Gas & Elec. Assn.* v. *Ocean Acc. & Guar. Corp. Ltd.* 330 Mass. 640, 657–658; *Pinet* v. *New Hampshire Fire Ins. Co.* 100 N. H. 346, 348–349, in which Kenison, C.J. said, "Both fair market value and replacement cost are permissible standards for determining fire losses but they are standards and not shackles"; *McAnarney* v. *Newark Fire Ins. Co.* 247 N. Y. 176, 180–186; *Britven* v. *Occidental Ins. Co.* 234 Iowa, 682, 686–688; Bonbright & Katz, Valuation of Property to Measure Fire Insurance Losses, 29 Col. L. Rev. 857, 878–900; Valuation and Measure of Recovery under Fire Insurance Policies, 49

Col. L. Rev. 818–824; Couch, Insurance, § 2234; Sedgwick, Damages (9th ed.) §§ 721–722; Sutherland, Damages (4th ed.) §§ 821, 825; annotation, 61 A. L. R. 2d 711, 725–733.

We do not agree with the defendants' contention that, even under the broad principles just discussed, the plaintiffs have not sustained their burden (see *Heebner* v. *Eagle Ins. Co.* 10 Gray, 131, 143; *Cory* v. *Boylston Fire & Marine Ins. Co.* 107 Mass. 140, 147; Appleman, Insurance Law & Practice, §§ 12,093, 12,233) of proving their loss with reasonable certainty. "It is of course true that damages must be reasonably ascertainable from the evidence. . . . But the fact that there is an element of uncertainty in their assessment is not a bar to recovery. . . . 'The amount of damages seldom can be proved with the exactness of mathematical demonstration. Much must be left to estimate and judgment, sometimes upon meager evidence.' " See *Dalton* v. *Demos Bros. Gen. Contractors, Inc.* 334 Mass. 377, 378–379 (tort injury to property from a negligent blast). See also *Bond Pharmacy, Inc.* v. *Cambridge,* 338 Mass. 488, 491–492, 493. Unreasonable certainty and precision are not to be required in proving the amount of this fire loss for which compensated insurers (cf. *Veneto* v. *McCloskey & Co.* 333 Mass. 95, 104) were bound to provide indemnity. This is not a case in which it is doubtful whether any fire loss has occurred. Cf. *Buffalo Ins. Co.* v. *Spach,* 277 F. 2d 529, 530–531 (5th Cir.). The "entire plant was demolished by fire." Recovery "will not be denied because . . . damages are difficult to ascertain. While the damages may not be determined by mere speculation or guess, it is enough if the evidence shows the extent of the damages as a matter of just and reasonable inference. A reasonable basis of computation and the best evidence . . . obtainable . . . which will enable the jury to arrive at an approximate estimate of the loss is sufficient." See *Vanguard Ins. Co.* v. *Connett,* 270 F. 2d 868, 870–871 (10th Cir.). See also *Pruitt* v. *Hardware Dealers Mut. Fire Ins. Co.* 112 F. 2d 140, 142 (5th Cir.).

In *Church of the Assumption of the Blessed Virgin* v.

*Travelers Fire Ins. Co.* 146 Conn. 223, the proof went "no further than to show that over two years before the fire the value of . . . [a convent] building was $67,750 and that demolition had progressed to the extent of about 10 per cent of the entire structure." The court stated (at p. 226) that the "jury were not supplied with any proof from which they could estimate the actual cash value . . . at the time of the fire with . . . reasonable certainty." Even if the jury could have inferred that the building in the two year period (p. 225) "had lost nothing in value through depreciation or obsolescence, or otherwise," the court perceived in the evidence "nothing to indicate the diminution in value due to . . . demolition" which (at p. 226) "might well have caused a heavy diminution in the value of the building as a whole, over and above the value of the materials or property actually removed." We think that this Connecticut case is distinguishable from the case before us in which there was the direct testimony of Sart (even if it was very general in terms and far from a comprehensive analysis of either market value or reproduction cost) that the Agoos plant, as it existed at the date of the fire, was worth $200,000 for tannery purposes. If, however, the Connecticut case must be taken as calling for more precise proof than we here require, we are not prepared to follow it.

Under the principles applicable in the valuation of Massachusetts fire insurance losses Sart's testimony about the value of the property for tannery purposes was relevant. The buildings had been used as a tannery and it could be inferred that such use of them was still appropriate if anyone wished so to use them. It could have been found that, within a few weeks of the loss, a possible (even if not probable) purchaser had visited the buildings. If a sale was in fact highly unlikely, that was a matter which only went to the weight of the testimony about value for tannery purposes.

It would have been appropriate for each of the parties to have given the jury far more guidance in appraising the loss, especially by presenting through competent engineers

testimony about the reproduction cost of the buildings, their accrued depreciation, their estimated remaining useful life, and the effect upon value of any partial demolition or removal of equipment prior to the loss. In a case where there is a substantial possibility of removal or demolition of buildings, such testimony of replacement cost and proper adjustments to reflect other considerations affecting physical value is likely to be a more reliable guide to "the actual intrinsic cash value of the property destroyed" (see *Washington Mills Emery Mfg. Co.* v. *Weymouth & Braintree Mut. Fire Ins. Co.* 135 Mass. 503, 505–507; see also *New England Gas & Elec. Assn.* v. *Ocean Acc. & Guar. Corp. Ltd.* 330 Mass. 640, 657–658) than evidence of market value. This is because, under the *Washington Mills* case, the insured is entitled to recover "such a sum as it would have cost at the time of the fire to have replaced and restored the property to the condition in which it was before, without regard to the fact that it was to be removed." Under the doctrine of *Kingsley* v. *Spofford,* 298 Mass. 469, 474–477, however, evidence of market value or going concern value, or special value for other purposes, is not to be excluded. The jury may apply their experience and judgment in determining whether and to what extent such evidence is to be given weight in the circumstances, notwithstanding that in such cases the authorities also permit consideration of replacement value. We think that the evidence of value on the date of the fire was not so slight and so indefinite as to require withholding the case from the jury.

2. The defendants called as a witness one Rosenburg, president, treasurer, and a director of Leather. He identified an agreement signed in the name of Leather by him as president, dated November 15, 1956. The agreement, when offered generally, was excluded upon the plaintiffs' general objection. The judge did not indicate the grounds of exclusion. An offer of proof consisting of the agreement itself was made with respect to each exclusion of testimony about it.

The agreement, which recited that it was duly authorized, was between Mystic Building Wrecking Co., Inc., and Leather. It did not refer to Tanning or to any vote by any corporate body of Leather authorizing its execution. For the demolition of "the buildings . . . on the land owned by" Leather, the wrecking company was to receive $12,000. Work was to commence not later than December 10, 1956, subject to the right of Leather to request a delay in commencement of the work for a reasonable time thereafter.

The obvious reason for the general offer of the agreement was to show absence of market value. On that issue it had probative value as fully as would a contract for the sale of the buildings. See *Brush Hill Dev. Inc.* v. *Commonwealth*, 338 Mass. 359, 364–366. The agreement would have been admissible ˙if it had been shown to have been binding on both coöwners, if both Leather and Tanning owned the buildings, or on the single corporate owner if there was only one owner. The ambiguous record, however, left in doubt the ownership of the buildings, and the precise relationship between Leather and Tanning, as well as whether Rosenburg was in fact authorized by either corporation to make this contract for the destruction of these substantial buildings. See *Horowitz* v. *S. Slater & Sons, Inc.* 265 Mass. 143, 147–148; *Stoneman* v. *Fox Film Corp.* 295 Mass. 419, 425. See also *Kagan* v. *Levenson*, 334 Mass. 100, 104–105; Restatement 2d: Agency, § 52, comment c; § 73. Cf. *Jackson* v. *Colonial Provision Co. Inc.* 314 Mass. 177, 179–180. There was no proof of any knowledge of, or acquiescence in, Rosenburg's execution of the agreement on the part of any other director of either Leather or Tanning. Cf. *Bloomberg* v. *Greylock Bdcst. Co., ante,* p. 542. Because the record did not show that the agreement was binding on the plant's owner or owners, the judge's exclusion of the agreement must be upheld. See *Palm* v. *Kulesza,* 333 Mass. 461, 463.

The agreement had some tendency to impeach Rosenburg's testimony that he had no opinion on ˙the value of the buildings. As a corporate officer he could hardly have

signed the agreement, if he thought the real estate would be worth more to the corporation if the buildings were left standing than if the land became vacant. Nevertheless, we think that exclusion of the agreement, when offered for this purpose, was not prejudicial. Rosenburg, even if a hostile witness, had expressed no opinion as to the value which could adversely affect the defendants. See G. L. c. 231, § 132; *Kavanaugh* v. *Colombo,* 304 Mass. 379, 381; *Klein* v. *Keresey,* 307 Mass. 51, 53; Wigmore, Evidence (3d ed.) § 1893.

*Exceptions overruled.*