Dortch-Okara, J.
Plaintiffs Westfield Realty Trust (“Westfield”) and Rosco Products, Inc. (“Rosco”) bring this action against Continental Casualty Company, Inc. (“Continental”) for damages for alleged violations of G.L.c. 93A, §2 and c. 176D, §3(9) arising from defendant’s adjustment of their insurance claims. These claims arose as a result of a fire on June 23, 1988.
A bench trial was held. Based on all the credible evidence and the reasonable inferences therefrom, the court makes the following:
FINDINGS OF FACT
1. Westfield is a realty trust which held title to a mill building and garage (referred to collectively as the “mill building”) on South Canal Street in Lawrence, Massachusetts. Rosco operated a textile printing business which was located in the mill building from 1982 until June, 1988. Robert Silverstein (“Silverstein”) was the sole shareholder of Rosco and trustee and the sole beneficiary of Westfield. Silverstein purchased the mill building on January 4, 1982 for $285,000 and made improvements to the mill building and its interior to accommodate his needs.
2. The mill building and all its contents were destroyed by fire on June 23, 1988.
3. At the time of the fire both Westfield and Rosco were insured with Continental under fire insurance policies containing Massachusetts standard fire provisions. Westfield’s coverage was for the mill building with a policy limit of $955,000 and Rosco’s was the contents of the mill building with a policy limit of $425,000.
4. The Massachusetts mandatory endorsement to the policies provided in pertinent part as follows:
5. Massachusetts Standard Fire Provisions
[Continental].. . does insure the insured named in the Declarations above and legal representatives, to the extent of the actual cash value of the properly at the time of loss, and without compensation for loss resulting from interruption of business or manufacture, . . .
Requirements in case loss occurs.
The insured shall give immediate written notice to this company of any loss, protect the property from further damage, forthwith separate the damaged and undamaged personal property, put it in the best possible order, furnish a complete inventory of the destroyed and damaged property, showing in detail the quantity, description, actual cash value and amount of loss claimed; and the insured shall forthwith render to this company a signed, sworn statement in proof of loss which sets forth to the best knowledge and belief of the insured the following: the time and cause of the loss, the interest of *496 the insured and of all others in the property, the actual cash value of each item thereof and the amount of loss thereto, all encumbrances thereon, all other contracts of insurance, whether valid or not, covering any of said property, and changes in the title, use, occupancy, location, possession, or exposures of said property, since the issuing of this policy, by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of loss and whether or not it then stood on leased ground, and shall furnish a copy of all the descriptions and schedules in all policies and detailed estimates for repair of the damage. The insured, as often may be reasonably required, shall exhibit to any person designated by this company all that remains of any property herein described, and submit to examinations under oath by any person named by this company, and subscribe the same; and, as often as may be reasonably required, shall produce for examination all books of account, bills, invoices, and other vouchers, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by this company or its representatives, and shall permit extracts and copies thereof to be made.
Appraisal.
In case of loss under this policy and a failure of the parties to agree as to the amount of loss, it is mutually agreed that the amount of such loss shall be referred to three disinterested men, the company and the insured each choosing one out of three persons to be named by the other, and the third being selected by the two so chosen, and the award in writing by a majority of the referees shall be conclusive and final upon the parties as to the amount of loss or damage, and such reference, unless waived by the parties, shall be a condition precedent to any right of action in law or equity to recover for such loss.
5. Silverstein hired Marvin Milton (“Milton”), a licensed public insurance adjuster, to adjust his claims with Continental. Silverstein testified that he made an attempt to go back into business between July, 1988 and December, 1988 while Milton handled his claim; however, there was no evidence to support this assertion. In any event, neither Westfield nor Rosco had been profitable for at least the two years immediately preceding the fire.
6. Milton began work on the claims on June 27, 1988 when he met at the fire site with Continental’s representatives, including Dennis Towers. Towers was a regional property specialist but was not responsible for the adjustment of these claims. Milton and Towers began to discuss the issue which proved to be the major source of contention between the parties, the approach to be taken to arrive at actual cash value. According to the fire insurance policies, plaintiffs were insured “to the extent of the actual cash value of the property at the time of the loss.” Milton recommended that Continental arrive at actual cash value through the replacement cost of the building less depreciation. Early in the evaluation of the claims, Continental apparently agreed. Milton and Towers independently computed the replacement cost of the building by using the Marshall-Swift Evaluation Service segregated cost method. Milton arrived at a replacement cost in excess of $ 1.5 million and submitted that figure to Continental. Towers obtained from Robert Reid of Insurance Reconstruction Services a report which arrived at a replacement cost in excess of $ 1.7 million. In addition, Jean Bragg, a local adjuster for Continental, performed her own Marshall-Swift evaluation of the destroyed buildings using a method of calculation different from the analysis performed by Milton. She arrived at a replacement cost of $1.8 million. Continental’s evaluations applied depreciation factors ranging from 25% to 35% and arrived at actual cash value figures which exceeded the Westfield policy limit. Continental had access to these evaluations by mid-July, 1988.
7. By as early as June 30, 1988, Towers had formed the opinion based on his “personal observation of damages,” that the loss was in excess of the policy limits. Writing to John Rawlings of Continental’s home office in Chicago, Towers stated that he needed a signed statement from the policyholder and a contents inventory from Milton. He ended the letter by recommending that the loss be settled in its entirety within 30 days provided that there is no culpability on the part of the policyholder. While Towers’ visual observations and recommendation indicate the likely extent of the loss, it would not be reasonable to expect that a claim of this magnitude would be paid without substantial additional documentation and investigation.
8. Continental’s Special. Investigations Unit investigated the cause of the fire. Investigator Wayne Johnson took recorded statements from Silverstein and his employee, James King. King was in the mill building at the time the fire was reported. The investigation was concluded by early August, 1988 and found “no involvement in the fire on the part of the Insured.” Nevertheless, Continental continued to monitor the ongoing investigations of the fire by the Lawrence Fire Department and the State Fire Marshall’s Office. The Fire Marshall’s investigation was not concluded until shortly after December 17, 1988 when Silverstein’s involvement was finally ruled out.
9. When Milton met with Continental representatives at the fire site on June 27, 1988, he was asked to supply detailed appraisals on the Westfield property, as well as a contents inventory for the Rosco claim. Milton responded first by submitting the Mar *497 shall Swift replacement cost data by July 11, 1988. A few days later, Milton submitted Rosco’s financial statement for its 1987 fiscal year. In mid-July, Continental requested sworn Proofs of Loss for the Westfield and Rosco claims. The requirement that a Proof of Loss be submitted by an insured is contained in the policy. These Proofs of Loss were submitted by Milton on July 22, 1988 and received by Continental on July 27, 1988. By letter dated August 9, 1988, Milton sent Continental an appraisal of the mill building performed in 1986 in connection with a mortgage, called the 1986 MINCO appraisal. This appraisal arrived a value of $503,000 for the mill building using the market approach to value. A 1988 update of the MINCO appraisal was also furnished to Continental in August. Through the months of August and September, Milton continued to submit data to Continental in response to the June 27, 1988 requests, as well as numerous later requests for more detailed documentation. Milton acknowledged that it was not until September 29, 1988 that he submitted materials which he considered a complete claim submission for Westfield and Rosco. Continental continued to request more information relating to the contents of the mill building for the Rosco claim. Milton’s submissions on the Rosco claim were not complete until December, 1988.
10. In August, 1988, Continental began to explore approaches to the valuation of the mill building other than reproduction cost less depreciation. Clearly, the purpose of this exploration was to attempt to reduce its exposure. Claims Supervisor Ivars Rudzitis (“Rudz-itis”) consulted Attorney James Moran (“Moran”) of Monrison, Mahoney and Miller concerning whether Massachusetts recognized the use of market value evidence in the course of arriving at actual cash value. Relying on Agoos Leather Companies, Inc. v. American and Foreign Insurance Company, 342 Mass. 603 (1961), Moran advised Continental that under the “broad evidence rule” a wide range of evidence is permissible, including market data, if it has a bearing on establishing the actual cash value of the destroyed property. Moran’s opinion was not incorrect. Market value and replacement cost less depreciation are appropriate and permissible approaches to value. It was neither unfair nor unreasonable for Continental to rely on Moran’s opinion.
11. On Moran’s recommendation, Continental retained its own real estate appraiser, John Sheehan (“Sheehan”), to appraise the mill building. In November, 1988, Continental received the Sheehan appraisal report. Sheehan analyzed the mill building using the income capitalization approach, the market approach (or sales comparison approach) and the reproduction cost less depreciation approach. He concluded that the market approach was the most reliable approach and found that the value of the properly, including the land, was $550,000. Deducting the value he ascribed to the land, Sheehan arrived at a value of $392,500 for the mill building.
12. Sheehan’s report contained some controversial assumptions. In arriving at a value using the depreciated reproduction cost approach, he deducted $985,000 from the reproduction cost of the building for what he described as “functional obsolescence.” As a result, the value using this approach was $494,000. Rudzitis acknowledged some of the shortcomings of the Sheehan report, as well as Sheehan’s lack of experience in the area of insurance indemnity.
13. Moran advised Continental that the Sheehan report was fair and reasonable. He concluded that Sheehan’s analysis was consistent with the 1986 MINCO appraisal submitted by Milton. He criticized the assessed value of the building because the square footage was overstated and found several omissions in the 1988 MINCO updated appraisal. For example, the 1988 MINCO appraisal appeared suspiciously high compared to the 1986 MINCO valuation and contained no comparable sales data. Moran took the position that the replacement cost less depreciation approach to value was used primarily for unique buildings such as churches or convents for which comparable sales data were not ordinarily available. Since there was nothing unique about the mill building, there would be many similar buildings for sale or lease to use for comparative purposes. For these reasons, Continental chose to rely on the Sheehan appraisal as the basis for an offer to settle the Westfield claim.
14. On December 22, 1988, Milton received Continental’s first offer of settlement regarding the Westfield claim. Continental offered $392,500 (less a $100,000 advance paid in August) for the mill building. Milton responded in writing on the same day, stating that he strenuously disagreed with Continental’s evaluation. After Milton had had an opportunity to review the Sheehan appraisal, he wrote again to Continental on January 9, 1989 with specific complaints about Sheehan’s work. Milton argued that (1) the market value approach “ignores the particular use of this building by a particular insured; (2) the insured’s policy, the Massachusetts standard fire policy and insurance industry custom all dictated that replacement cost less depreciation and not market value was the proper method for valuing the loss; and (3) Sheehan had inappropriately made a reduction for functional obsolescence.
15. On December 21, 1988, the day before Milton received Continental’s offer of settlement, Milton wrote to Continental alleging a violation of G.L.c. 93A, §11 in Continental’s failure to negotiate the Westfield and Rosco claims. Also included in this letter was Milton’s request that the claims be resolved by a reference proceeding in accordance with the policy and pursuant to G.L.c. 175, §§99 and 100, et seq.
16. On January 6, 1989, Continental paid Westfield the sum of $356,500. This represented the balance of *498 the amount Continental determined as the actual cash value of the mill building ($291,500), plus the full amount of the demolition cost ($65,000). On the same day, Continental paid Rosco the amount of $150,000 as partial payment for its property loss. By the end of December, Continental had completed its verification of the property loss and had decided to settle the Rosco claim for the full amount of the policy limit. On January 16, 1989, Continental paid Rosco $275,000 in full payment of the balance of its property loss claim.
17. The reference proceeding requested by Milton on behalf of Westfield commenced in May, 1989. During the course of the reference proceeding, Westfield provided to Continental a third MINCO appraisal performed in 1989. According to this appraisal, the value of the mill building was $625,000. Continental offered to settle the Westfield claim for this $625,000 amount. Silverstein rejected the offer, stating that he would accept no less than the full policy limit. At the conclusion of the reference proceeding, Westfield was awarded the sum of $952,561.00. On September 7, 1989, Continental paid Westfield $567,300.78. This represented the amount of the reference award above the amounts already paid by Continental and interest of $75,177.28 at the rate provided by statute. Also on September 7, 1989, Continental paid Rosco $18,518.49 in interest. Both interest payments were calculated from August 24, 1988.
18. The reference proceeding was requested by Milton on behalf of Westfield because Continental and Milton were unable to agree on the value ofWestfield’s claim. Both the insured party and the insurer had the right to request a reference proceeding and may have done so at any time. Hence, Milton was not compelled by Continental to wait until December, 1988 to request the reference.
19. In conclusion, the court finds that Continental worked diligently and fairly to adjust the Westfield and Rosco claims. Continental resolved Rosco’s property loss claim by agreement, paying the policy limit. In addition, it resolved Westfield’s lost rent and demolition claims by agreement. Continental paid Westfield the full amount of what Continental determined was the value of the mill building reasonably promptly after Milton completed his submissions, after the receipt by Continental of the Sheehan appraisal and after the conclusion of the Fire Marshall’s investigation.
RULINGS OF LAW
1.While plaintiffs have brought this action under G.L.c. 93A, §§9 and 11, any relief to which they may be entitled must arise under Section 11. Westfield was a Massachusetts Realty Trust engaged in trade or commerce for the purposes of G.L.c. 93A at all times material to this action. Rosco, a Massachusetts corporation, was likewise engaged in trade or commerce. General Laws c. 93A, §11 provides in relevant part that, “(a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property ... as a result of the use or employment by another person who engages in any trade or commerce of an unfair ... or deceptive act or practice declared unlawful . . . may . . . bring an action in the superior court...” Section 9 provides a right of action only to those “persons” who are not entitled to bring action under Section 11. G.L.c. 93A, §§9, 11.
2. As claimants under G.L.c. 93A, §11, plaintiffs have no right to assert violations of G.L.c. 176D, §3(9) as grounds for relief. “A person whose rights are affected by a violation of G. L. c. 17 6D, §3 (9), has a right of action under G.L.c. 93A, §9, but by express language in §9(a), that right does not inhere in a person entitled to bring an action under G.L.c. 93A, §11; i.e., a business against business 93A claim does not lie for violation of G.L.c. 176D, §3(9).” Transamerica Ins. Group v. Turner Construction Co., 33 Mass.App.Ct. 446, 452 (1992); DiVenuti v. Reardon, 37 Mass.App.Ct. 73, 79 (1994). Therefore, to the extent that plaintiffs rely upon alleged unfair claims settlement practices as the bases for their action, no remedy is afforded.
3. Even if G.L.c. 176D, §3(9) could serve as grounds for relief under G.L.c. 93A, §11, plaintiffs have failed to prove any violations by Continental. With respect to Section 3(9) (b), Continental was in constant communication with plaintiffs, through the adjuster, Milton. There was no evidence that Milton’s communications with Continental and its representations were ignored or that Continental failed to respond to any inquiry. Section 3(9) (f) requires prompt, fair and equitable settlements of claims in which liability has become reasonably clear. Here, liability under the insurance policies was immediately clear, provided that Silverst-ein was not culpable. The major issue in contention was the valuation of the claims. The policy of insurance and statutory requirements provided the mechanism for resolution of this issue. Surely, Continental is allowed a reasonable period of time to investigate the value of such a significant claim and to ascertain that the insured was not involved in the fire before it begins to negotiate a claim. At trial, Milton readily acknowledged that he did not submit what he considered full documentation of the claims until September 29, 1988, and it took additional time for Milton to comply with Continental’s requests for further detail. Continental’s appraisal was not completed until November and the Fire Marshall’s investigation was not concluded until December, 1988. In late December, Continental made its first offer to settle the Westfield claim and settled the Rosco claim by January, 1989. With regard to section 3(9) (g), Continental did not compel litigation but merely participated in a statutorily-mandated reference proceeding at Westfield’s request. While Continental’s settlement offers were substantially less than the amount ultimately recovered by Westfield, that fact alone does not prove bad faith. In the circumstances of this case, the difference in the parties views on valuation was attributable to *499 an honest, good faith difference of opinion as to the proper approach to the valuation of the mill building.
4. Having considered Continental’s actions apart from G.L.c. 176D, §3(9), the court finds no conduct that was unfair or deceptive in its dealings with plaintiffs. While plaintiffs allege that Continental violated its implied covenant of good faith and fair dealing, there is no evidence to support this. Continental’s claims adjustment procedures were undertaken in accordance with the provisions of the fire insurance policy and were carried out in full compliance with statutory requirements. General Laws c. 175, §§99, 100, et seq. govern the reference proceeding that the parties undertook to resolve their differences. Continental participated fully in this proceeding, continued to negotiate to settle the claim, and paid the reference award with interest.
5. The standard of unfairness under which a defendant is judged in a G.L.c. 93A, §11 action is different from the standard applicable where consumers bring actions under Section 9. Madan v. Royal Indemnity Company, 26 Mass.App.Ct. 756, 763 (1989). “The objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce.” Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979). There are, “cases where an act might be unfair if practiced upon a commercial innocent yet would be common practice between two people engaged in business.” Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 475 (1991). In this case, the fact that an offer of settlement of the claims was not made until six months after the loss and the fact that Westfield was required to pay its share of the costs (and its own attorneys fees) incurred in the statutorily-mandated reference proceeding are not sufficient to support a claim under G.L.c. 93A, §11.
ORDER FOR JUDGMENT
Accordingly, judgment shall enter for the defendant Continental Casualty Company.