The case before us involves the extent to which a developer of commercial property owed a commission to a real estate broker with respect to a specific lease that the developer executed with a third party. Following a Superior Court jury trial, and the denial of the plaintiff's motion for additur (or in the alternative for a new trial on damages), both sides appealed. We affirm the amended judgment and the trial judge's posttrial rulings in all respects.
Background.[3] At the center of this case is a twenty-seven acre parcel of vacant land in the town of Greenfield (the property). Defendant Louis L. Ceruzzi formed Greenfield Property Development, LLC (the developer), in order to acquire the property and to develop it into commercial uses. Ceruzzi had learned of the property (and the potential opportunities it presented) from Michael B. Hotarek, the principal of the plaintiff, Eastern Retail Properties, Inc. (collectively, the broker). After the developer eventually purchased the property, it paid the broker a commission of $225,000 pursuant to a contract between the firms known as a "buyer's representation agreement."
The developer also enlisted the broker in an effort to secure future tenants for the property, as set forth in a separate "exclusive listing agreement" (listing agreement). Under the listing agreement, the broker was to be paid a commission for each such tenancy, in accordance with complicated formulas specified there. For those tenants who leased over 10,000 square feet, the commission would be determined on a per square foot basis; for smaller tenants (such as a nail salon or bank), the commission would be determined as a percentage of the rents owed under the relevant lease.
One potential tenant for the property was the grocery chain known as Stop & Shop, which owned an existing store across the street. Accordingly, it had a potential interest in moving its store there, or, alternatively, in preventing a competitor from opening there. Additionally, Stop & Shop at times invested in commercial developments spearheaded by others.
The developer eventually entered into a complicated contractual arrangement with Stop & Shop during the period for which the listing agreement was in effect. Although one of the key underlying contracts setting forth the relationship between the developer and Stop & Shop is termed a "master ground lease," that document differs from a typical lease in some respects (as will be discussed further below). The broker brought this action claiming that the execution of the master ground lease triggered the developer's obligation to pay it a commission under the listing agreement.
A Superior Court jury found that the developer breached the listing agreement, and the judge adopted the jury's advisory verdict that the developer's actions also violated G. L. c. 93A. However, the jury awarded the broker contractual damages of only $100,000, not the approximately $836,000 in damages it had sought. The broker filed a motion for additur or, in the alternative, a new trial, which the trial judge denied (explaining her ruling in a thoughtful memorandum of decision). In addition, although the judge awarded the broker attorney's fees pursuant to c. 93A, she gave the broker only $137,975 of the $358,398 in attorney's fees that it had sought, and $14,464 of the $28,162 in costs it had requested.[4] The judge set the recoverable fees and costs at that lower figure in part because of the limited amount of damages that the jury had awarded the broker.
Unsatisfied with the amount of damages and attorney's fees and costs it obtained, the broker appealed. It argues that having found that the developer violated the listing agreement, the jury were required to calculate damages based on the formulas set forth in that contract, and that application of those formulas generates damages in the requested amount of $836,817.39.[5] Based on this, the broker requests a new trial on damages only or, in the alternative, on all issues. In a cross appeal, the developer argues that the broker's contract claim never should have gone to the jury because-as a matter of law-no commission was due under the terms of the listing agreement.[6] The developer also argues that even if the jury's finding of a contract breach is to stand, the judge's finding of a c. 93A breach fails as a matter of law.
Contractual liability. In 2005, the developer entered into a purchase and sale agreement to buy the property. Ceruzzi testified, and the jury could have found, that the developer agreed to buy the property only after securing Stop & Shop's commitment to "backstop" the purchase. Specifically, through a series of letter agreements, Stop & Shop agreed to make "property control payments" that allowed the developer to pursue the acquisition and development of the property. The letter agreements expressly contemplated that the developer and Stop & Shop eventually would enter into leases to effect their arrangement.
On March 30, 2007, the developer and Stop & Shop executed a master ground lease for a seventeen-acre portion of the property.[7] Simultaneously, those parties entered into a "take-back ground sublease" in which Stop & Shop leased the land back to the developer. The net effect of the two simultaneously executed leases was to leave control of the property with the developer, with the significant exception that the developer could not then sublease it to another grocery store. In addition, once the property was developed and the developer received a specified return on its development costs, Stop & Shop could receive payments to offset the "rent" it was obligated to pay under the master ground lease agreement.
In this manner, the "rent" that Stop & Shop agreed to pay was not to occupy the property itself, but instead to limit the occupancy of it by Stop & Shop's direct competitors (with the potential for reimbursement of such payments from the profits of the development that these payments allowed to go forward). The developer in turn obtained a means of financing the property. The broker's principal admitted that he had "never seen a deal structured like this before with a master ground lease and a simultaneous take-back sublease."
Under these circumstances, the jury reasonably could have concluded that even though the master ground lease was nominally a "lease," it was not the sort of lease that the parties had agreed would require the payment of a commission under the listing agreement.[8] See General Convention of the New Jerusalem in the U.S., Inc. v. MacKenzie, 449 Mass. 832, 836 (2007) (extrinsic evidence may be introduced to shed light on what parties intended "when a contract is ambiguous on its face or as applied to the subject matter"). As the trial judge aptly put it, quoting from the listing agreement:
"The jury could have fairly concluded that the listing agreement governed only transactions culminating in occupancy of the property. The listing agreement concerned offers 'to lease, purchase or otherwise occupy the Property.' ... [The broker] agreed to 'use its best efforts to effect leases, sales, and/or other property rights disposition agreements for occupancy of the Property by users.' ... [The developer] gave [the broker] the exclusive right to advertise and offer the property 'for occupancy pursuant to leases, or other acceptable property disposition.' "
In addition, the developer had a reasonably strong argument that because continuing litigation by third parties had held up the permitting of any end uses of the property, a key precondition to the developer's obligation to pay a commission had not been met.[9]
Thus, the developer had robust arguments that the jury should interpret the listing agreement in its favor.[10] However, it hardly follows that the listing agreement was unambiguous and therefore must have been interpreted in the developer's favor as a matter of law. This is especially true given that, in the context of this case, we are to uphold the jury's verdict if "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of [the prevailing party]." Dobos v. Driscoll, 404 Mass. 634, 656 (1989) (quotation omitted). We do not need to search far for such support. After all, the listing agreement expressly contemplated that the developer generally would owe a commission for the execution of "leases," including "ground leases," the developer chose to structure its arrangement with Stop & Shop to include a ground lease, and Ceruzzi testified that it qualifies as a lease.[11] In sum, we conclude that the language of the listing agreement raised an open question whether a commission was owed on the master ground lease, and that this was a question of fact appropriately resolved by the jury. See generally DiPietro v. Sipex Corp., 69 Mass. App. Ct. 29, 38 (2007) ( "Whether a material breach has occurred is a question of fact ... ordinarily to be decided by a jury"). The trial judge did not err in denying the developer's motions for directed verdict.
Chapter 93A liability. The developer also argues that in refusing to pay the broker a commission under the listing agreement, it merely was reasonably asserting its differing interpretation of the contract. In other words, the developer argues that this was an ordinary contract dispute, not one in which it was engaged in unfair or deceptive conduct necessary to support a violation of c. 93A, § 11. See Levings v. Forbes & Wallace, Inc., 8 Mass. App. Ct. 498, 504 (1979) ("[O]bjectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce"); Madan v. Royal Indem. Co., 26 Mass. App. Ct. 756, 762 (1989) ("[M]ere breach of a contract, without more, does not amount to a c. 93A violation"). For the reasons that follow, we conclude that there was sufficient evidence on which the judge could disagree with that assessment.
It is uncontested that over a lengthy period of time, the broker repeatedly inquired about the status of any deal with Stop & Shop. Each time, the developer (mis)informed the broker that no deal with Stop & Shop had been executed. According to the testimony of the broker's principal, which the judge was free to accept, it was only through happenstance that the broker learned in 2012 that the developer and Stop & Shop had entered into the master ground lease five years earlier. Also coloring the developer's conduct is the fact that although the developer indisputably owed the broker a $225,000 commission under the buyer's representation agreement and that payment was due at the time of closing (which occurred in December of 2010), the developer never informed the broker that the closing had taken place. Instead, the broker learned that the developer had purchased the property through its checking local assessor's records almost a year later.
In sum, the judge rationally could conclude, on this record, that the developer was not merely asserting its interpretation of the listing agreement, but instead engaged in affirmatively misleading the broker to prevent it from asserting its contractual rights. The implied finding that the developer engaged in unfair or deceptive conduct is not clearly erroneous, and therefore must be upheld.[12] See Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 476 (1991).
Amount of damages. A trial judge's denial of a motion for additur or new trial is reviewed only for an abuse of discretion. Proctor v. North Shore Community Arts Foundation, 47 Mass. App. Ct. 372, 376-377 (1999). In considering whether a judge abused her discretion, it is important to consider the judge's own limited role in considering such a motion. Because it is the jury's role to determine the appropriate amount of damages based on the evidence presented, a posttrial motion for a new trial asserting that the jury awarded inadequate (or excessive) damages "ought not to be granted unless on a survey of the whole case it appears to the judicial conscience and judgment that otherwise a miscarriage of justice will result." Walsh v. Chestnut Hill Bank & Trust Co., 414 Mass. 283, 292 (1993) (quotation omitted). With this standard in mind, we turn to the broker's arguments that the jury's award of only $100,000 in contractual damages cannot be justified on this record.
By way of a special verdict, the jury specifically found that the developer "breach[ed] its contract with" the broker (that is, the listing agreement). The broker assumes that this means that the jury must have determined that the execution of the master ground lease triggered the need for the developer to pay a commission. This does not necessarily follow. That is because the jury could have concluded that the developer breached a different provision of the contract, such as the implied covenant of good faith and fair dealing. In any event, even if the jury concluded that the master ground lease was a "lease" for which a commission was due, we are unpersuaded that therefore the jury were barred from giving the broker anything less than the $836,817.39 it requested.
The paragraph of the listing agreement that expressly references ground leases ties the amount of any commission due to the square footage covered by the lease. Specifically, the provision states as follows:
"In the event of a ground lease by a Tenant up to 10,000 SF [square feet], then the commission to [the broker] shall be six percent (6%) of the total net rental income for the first ten years of the lease term and one percent for all subsequent years of the primary lease term. Ground leases by retailers over 10,000 SF will be paid on a per square foot basis, subject to the schedule above."
The ground lease here nominally covered seventeen acres, which is the equivalent of 740,520 square feet (a figure that dwarfs the 165,000 square feet of "gross leasable area" contemplated by the listing agreement). If that figure were used, then, under a provision of the listing agreement applicable to tenancies "in excess of 60,001 SF [square feet]," the commission due would be "$3.00 per square foot," which would come to over $2.2 million. In fact, this was the amount that the broker originally claimed it was owed (as spelled out in the broker's initial responses to interrogatories). However, the broker eventually abandoned that position, claiming that it had made a mistake in applying the formulas included in the listing agreement.
Having abandoned the straightforward-if arguably rapacious-interpretation of how much of a commission was due under the listing agreement's formulas, the broker had to come up with an alternative way to interpret those formulas. Even though the master ground lease nominally covered some 740,520 square feet, no specific amount of such land was required to be developed pursuant to that lease. Based on this, the broker maintained that the master ground lease properly should be classified as one for "zero developable square footage," and that the applicable provision of the listing agreement was the one that covered "deals that are between 0-10,000 [square feet]." Under that provision, the commission would be set as a percentage of the rental income stream owed under the master ground lease for zero square feet, resulting, according to the broker, in the requested commission of $836,817.39.[13]
The developer argues that this made no sense, because the formulas that allow a commission to be set based on a percentage of total rents was inserted to apply to small tenants who needed only "up to 10,000 square feet" for their uses, not to a lessee in Stop & Shop's sui generis position. The jury were entitled to accept the developer's argument on this point.
As the broker highlights, the jury received general instructions about expectations damages, namely that "the injured party should be put in as good a position as it would have been in had the other party fully performed its obligations under the contract." However, under the facts of this case, that background principle does not generate any simple answer as to what it would take to make the broker whole. As noted, the jury had sound grounds to reject the broker's specific theory of how much of a commission was due, and beyond that, it is difficult to try to make the agreed-upon formulas fit the specific lease at issue. In sum, under the evidence before the jury, there is nothing that required the jury to find damages of $836,817.39.
Of course, if the application of the specified formulas made no sense here, this begs the question of how the jury were supposed to measure damages. In the end, our job is not to resolve how the jury came up with the ultimate figure they settled upon, but to assess whether that figure finds some grounding in the evidence. See Agoos Leather Cos. v. American & Foreign Ins. Co., 342 Mass. 603, 608 (1961) ("While the damages may not be determined by mere speculation or guess, it is enough if the evidence shows the extent of the damages as a matter of just and reasonable inference" [quotation omitted] ); Aimtek, Inc. v. Norton Co., 69 Mass. App. Ct. 660, 667 (2007). As set forth below, there are in fact at least two separate paths that the jury reasonably could have used in arriving at the $100,000 figure.
In trying to do its best to apply the ill-fitting formulas set forth in the listing agreement, the jury could have considered that the net practical effect of the Stop & Shop lease/lease back for the future development was to prevent the opening of a competing grocery store there. This potentially affected the broker by depriving it of a commission for securing such a use, and it follows that requiring the developer to pay that lost commission arguably would make the broker whole. There was evidence before the jury that such a commission would have been approximately $100,000,[14] the very amount that the jury awarded.
There is an alternative path that the jury could have used to arrive at the same figure. In addition to instructing the jury about making the victim of a contractual breach whole, the judge instructed them that the broker "must establish that its damages are ascertainable by reference to some definite standard, either of market value, of established experience or by direct inferences from known facts." Given that application of the specified formulas made such little sense, the jury readily could have interpreted this instruction as allowing them to cap the broker's damages at the fair market value of the services that it provided.[15] There was evidence upon which the jury could have concluded that the fair market value of what the broker provided with respect to the Stop & Shop deal was $100,000.[16]
That the jury could have interpreted the judge's instructions as allowing them to consider the fair market value of the broker's services is further supported by certain uncontested evidence that the jury heard. When Hotarek initially demanded that the developer pay a commission pursuant to the listing agreement, he made no effort to base his demand on the formulas set forth there. Rather, he informed the developer, in writing, that he was "not looking for anything more than a fair market fee for the Stop & Shop deal and wanted to reach out and determine what you felt was appropriate." The jury were not required to view that statement as the broker's principal now maintains he intended it, an offer to compromise what was otherwise due under the listing agreement.
Finally, we note that the jury's damages award is not only technically supportable, it demonstrates that the jury ably sought to carry out their role of securing a fair and just result based on the evidence and arguments before them. The trial judge plainly did not abuse her discretion in letting the jury's verdict stand.
Trial court's c. 93A attorney's fees award. The broker acknowledges that a judge has discretion to reduce a request for attorney's fees based on the limited amount of damages obtained. See Haddad v. Wal-Mart Stores, Inc., 455 Mass. 1024, 1025 (2010). Its argument that the amount of the attorney's fees award here needs to be revisited is based entirely on its premise that the jury's damages award was unjustifiably low. Since we reject that premise, its challenge to the amount of attorney's fees awarded fails.
Appellate attorney's fees and costs. The developer's cross appeal required the broker to defend the judge's finding that the developer violated G. L. c. 93A (an issue the broker addressed in two and one-half pages of its reply brief). The broker is entitled to an appropriate portion of its appellate attorney's fees and costs incurred in doing so. G. L. c. 93A, § 11. Within fifteen days of the date of the rescript of this decision, the broker shall submit a statement of such fees and costs in accordance with the procedure specified in Fabre v. Walton, 441 Mass. 9, 10-11 (2004), and within fifteen days thereafter, the developer may submit an opposition to the amount requested.[17]
Order denying posttrial motion for additur or for new trial on damages affirmed.
Amended judgment affirmed.

The factual statements included in this section are essentially uncontested. Additional facts are reserved for later discussion.

The judgment was later amended to reflect the $100,000 damages award, inadvertently omitted from the original judgment. The amended judgment retained the original attorney's fee award, but increased the award for costs to $49,732.80.

The developer argues, with at least some force, that the broker effectively is claiming that the jury's verdict on contractual liability is inconsistent with its verdict on damages, and that such a claim was waived because the broker did not raise it before the jury were discharged. See Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459, 466 (2003). The broker argues that it did not waive its claim, because the path it followed (a posttrial motion for additur or new trial) is specifically countenanced by the rules. See Mass.R.Civ.P. 59(a), 365 Mass. 827 (1974). For purposes of our analysis, we assume arguendo that the broker did not waive its argument and proceed to the merits.

The developer filed motions for a directed verdict during the trial, and the broker concedes that the developer preserved its argument that the broker's claims fail as a matter of law.

The parties never explained why the master ground lease was for only seventeen acres of the twenty-seven acre property. However, one witness testified that, as part of the permitting process, the town required that ten acres of the property be set aside as open space.

Adding some support for such an interpretation is a fact that neither side has highlighted. According to the listing agreement, the specific development contemplated by the parties was for only "165,000 square feet [that is, approximately four acres] of gross leasable area." In contrast, the master ground lease was for approximately seventeen acres.

The developer maintained that the "backstopping" agreement it had with Stop & Shop was really part and parcel of its purchase of the property (and therefore something for which the broker already had been compensated when it received the $225,000 commission under the buyer's representation agreement).

Prior to trial, the broker sought partial summary judgment on its breach of contract claim that the developer's entering into the master ground lease triggered the payment of a commission under the listing agreement. In a well-reasoned memorandum and order denying that motion, a Superior Court judge different from the trial judge ruled that a jury could conclude that the master ground lease was not a lease covered by the listing agreement.

In addition, with regard to the developer's argument that the preconditions for its obligation to pay a commission had not been met because of outstanding permitting issues, we note that Stop & Shop's obligation to pay "rent" for its particular "use" of the property was not dependent on any such contingencies.

In adopting the jury's advisory verdict on the c. 93A claim, the judge did not issue any findings pursuant to Mass.R.Civ.P. 52, as amended, 423 Mass. 1408 (1996). Any claim that this amounted to error has been waived.

The broker offered no explanation-to the jury or to us-for why it used the specific formulas included in the listing agreement that apply to building leases and not those that apply to "ground leases." It also bears noting that there was a dispute at trial as to which rental figures should be used in applying the formula. The original agreement between Shop & Shop and the developer gave Stop & Shop the option of amortizing its prelease property control payments through increasing the rent that would be due under the lease. Stop & Shop eventually elected this option, and the original rent due under the lease was amended upwards as a result. Among its many other contentions at trial, the developer maintained that this additional increment should not be included in any "rent" used in the formula.

According to the trial testimony, Stop & Shop was developing stores between 65,000 and 72,000 square feet during the relevant time period. If Stop & Shop or one of its competitors had entered into a lease for a store of that size, under the listing agreement this would have generated a total commission of between $195,000 and $216,000, which-if split between two brokers in accordance with industry practice-would have generated a net commission to the broker of between $97,500 and $108,000.

The broker protests that the "market value" instruction was boilerplate intended for a different, more limited purpose. Of course, what ultimately matters is how the jury reasonably could have interpreted the instruction, not what the parties or judge intended. To the extent that the instruction was not clear, the broker is not now in a position to object. See Aimtek, Inc. v. Norton Co., 69 Mass. App. Ct. at 667 (unobjected-to instructions become law of case). Finally, we note that the fact that the judge allowed the dismissal of the broker's unjust enrichment claim does not change this analysis.

In an internal memo written while the listing agreement was being negotiated, the developer's vice president recommended to Ceruzzi that the agreement include a specific provision that required the developer to pay a flat $100,000 commission if Stop & Shop entered into a lease at the property. Although that recommendation was never accepted by Ceruzzi, nor the $100,000 figure communicated to the broker, it remains some evidence of the market value of the broker's services.

The developer also requested its appellate attorney's fees and costs without stating any basis for such an award. That request is denied.